**Kimberly Lagayle McCARTHY,**
**Appellant,**

v.

**The STATE of Texas.**

No. 73350.

Court of Criminal Appeals of Texas.

Dec. 12, 2001.

Rehearing Denied Feb. 6, 2002.

Douglas H. Parks, Dallas, for Appellant.

Karen R. Wise, Asst. DA, Dallas, Matthew Paul, State's Atty., Austin, for State.

## *OPINION*

COCHRAN, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, JOHNSON, and HOLCOMB, JJ., joined.

On November 17, 1998, a jury convicted appellant of the capital murder of Dr. Dorothy Booth, an elderly retired professor, a murder which was alleged to have occurred on July 21, 1997. *See* Tex. Penal Code Ann. § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. *See* Tex.Code Crim. Proc. Ann. Art. 37.071 § 2(g).[1] Direct appeal to this Court is

---

1. Unless otherwise indicated, all future references to Articles refer to Code of Criminal Procedure.

automatic. *See* Article 37.071 § 2(h). Appellant raises nineteen points of error, but does not challenge the sufficiency of the evidence at either stage of the trial. We will reverse.

## I.

■ Appellant argues in her first point of error that the trial court's admission of her custodial statement violated her right to counsel under the Fifth and Fourteenth Amendments to the United States Constitution. Appellant specifically asserts that the statement was inadmissible because the police questioned her without an attorney present after she had unambiguously invoked her right to counsel.[2] We agree.

The trial court held a hearing on appellant's motion to suppress her statement. At the hearing, the evidence showed that Sergeant Patrick Stallings of the Lancaster Police Department arrested appellant on July 24, 1997. Stallings stated that after he arrested appellant, he tried to interview her. He testified that "during the interview, [appellant] said she wanted to give a statement, and at the beginning when we started to take the statement, she asked me to write it, then she invoked her right to have an attorney." Stallings stopped the interview at that point. Appellant also told Stallings that "she did not want to talk with us any further." Stallings testified that he could not interview appellant any further because she had asked for an attorney. He did not provide her with an attorney, but he did immediately cease the interview. Appellant was transferred from Lancaster to the Lew Sterrett Justice Center in Dallas.

On July 28, 1997, Detective Dwayne Bishop of the Dallas Police Department telephoned Stallings to inquire about the case. Bishop told Stallings that Aaron McCarthy, appellant's husband, asked Bishop to speak with appellant at the Dallas County Jail. Stallings discussed the facts of the case with Bishop and faxed three pages of related information to Bishop. Stallings testified that, "prior to the time Detective Bishop ever went to see" appellant, Stallings "clearly told [Bishop] that [he] had tried to talk to her, she invoked her right not to talk to [him] and invoked her right to an attorney." It was Stallings' understanding that Bishop would "try to get a statement from her." Bishop testified, however, that Stallings failed to inform him that appellant had invoked her right to counsel.

On July 29, 1997, Bishop visited appellant at the Sterrett Center. Bishop testified that he read appellant her *Miranda* rights.[3] According to Bishop, appellant stated that she understood her rights and indicated that she wanted to continue talking without the presence of an attorney. Bishop testified that he did not threaten or coerce appellant or promise her anything in exchange for her statement. The rec-

---

2. Appellant also contends that the trial court failed to file findings of fact and conclusions of law on the issue of the voluntariness of her confession, which is required by Article 38.22. Appellant failed, however, to explain how the factual record proves that her confession to the police was made involuntarily, failed to present any legal authority to support the argument that her confession was involuntary, and failed to apply the law to the facts to support the conclusion that her confession was involuntary. Therefore, we conclude that the issue of the voluntariness of appellant's confession was inadequately briefed and presents nothing for review. Tex.R.App. P. 38.1. It does not, therefore, justify an order from this Court remanding this cause to the trial court to conduct a hearing into the voluntariness of appellant's confession and ordering the trial court to enter findings of fact and conclusions of law thereto.

3. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ord, however, does show that Bishop made no attempt to determine if appellant had an attorney so that he could contact that attorney. The record also demonstrates that appellant did not initiate the meeting with Bishop.

Appellant argued in support of her pre-trial motion to suppress her custodial statement that:

> The defendant's position, Your Honor, is that she clearly invoked her right to counsel prior to the time she made any statement. Defendant's position is that she clearly invoked her Fifth Amendment privilege and the rights afforded to her under 38.22 of the Texas Code of Criminal Procedure, the rights given to her by Article I, Section 19 and 189 of the Texas Constitution not the make any statement and not to—well, invoke her right to counsel.
>
> We think the evidence is clear that after she invoked those rights, agents of law enforcement approached her and initiated further contact, and as a result of that this statement is produced. We feel that this is a violation of those rights guaranteed to the defendant and we would ask that the statement be quashed.

The State did not respond. The trial court summarily ruled that the statement was admissible. When the State moved to admit appellant's statement into evidence during its case-in-chief at trial, appellant renewed her objection. The trial court stated that its prior ruling stood and admitted the statement.[4]

---

4. Appellant's written statement reads as follows:

> Early Tuesday morning about 1:30 a.m., drugs were delivered to me at my residence by "Kilo" and "J.C.", two guys I met in South Dallas selling drugs, about a month or so ago. Both guys stayed at my residence & partied with me. After my money & the drugs ran out, they asked if I could get some more money. I told them no. They asked me if I knew any of my neighbors I could borrow money from & I said no, not at that hour & that I had to go to work. At that time they began to be verbally abusive & threatening to harm me if I didn't. I called my neighbor "Dorothy Booth". I'm not sure of the time & got no answer. I waited a while & called back, she answered. "Kilo" told me to hang up & I did. He told me to call back & ask her to borrow some sugar or milk instead of money over the phone, because they were going to rob her & take the car. I called back & asked to borrow sugar, she said ok. Kilo & J.C. followed me to her house, when she opened the door & saw me, to let me in they both pushed the door open & knocked her down. I was shoved back outside to her car. The driver side was unlocked & I was told to stay there & lay down in the front seat. Several minutes later they both came out with her car keys, purse, & CD player. Both guys went back into my house & came out with a jam box, cordless phone & caller ID. They told me to drive to Mi Amore motel on second avenue to make a pick up. I was told to park on the next street over & wait for them. After about 3–5 minutes or so I drove off with all the belongings they took & went to Fitzhugh to the dope house. No one answered the door so I went to Perry street dope house. I took everything out of the car & went inside to get dope. They didn't have any so "Smiley" said he would go around the corner & get me some. I gave him the keys & another girl rode with him. They came back & the police stopped them in front of the dope house on Perry street. I went to the back of the house & waited a few minutes & left out the back door to get drugs elsewhere. A few hours later I returned to Perry street dope house & "Smiley" was upset that the cops stopped him. He gave me the car keys back. He asked me if the car was stolen & I said no. He wanted to rent it out for dope so I did & left. After the dope ran out I searched the purse & found a diamond ring & credit cards. I took the ring to the pawn shop & sold it. Later I used the credit card at the grocery store & gas station to purchase cigarettes by the carton for resale at the "boot leg" for cash. I went to a friend's house to smoke dope. He sold the caller ID and cordless phone for dope

## II.

■ Appellant argues on appeal that her statement was inadmissible because Bishop approached her and initiated further contact after she invoked her right to counsel. She is correct.

■ Once a suspect has invoked the right to counsel during questioning by law enforcement, the Fifth Amendment right to counsel has been invoked and all interrogation by the police must cease until counsel is provided or the suspect reinitiates conversation. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda,* 384 U.S. at 474, 86 S.Ct. 1602; *Dinkins v. State,* 894 S.W.2d 330, 350–51 (Tex.Crim.App.1995).

■ This is a clear, "bright line" constitutional mandate frequently repeated by the United States Supreme Court. *See Minnick v. Mississippi,* 498 U.S. 146, 150, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (tracing the historical reiterations of the rule and noting that "[t]he merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application"). This bright and unbending rule "conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of *Miranda* in practical and straightforward terms." *Minnick,* 498 U.S. at 151, 111 S.Ct. 486.[5] State courts are not free to deviate from the firm constitutional mandate set out in *Edwards.*

■ There is no evidence in this record that appellant consulted with counsel before Detective Bishop questioned her. There is no evidence in this record that appellant herself affirmatively reinitiated conversations with law enforcement. The State does not argue that appellant waived her right to counsel in either of these modes. Instead, the State contends that Bishop did not, in fact, coerce or badger appellant into making a written statement, and therefore, the underlying purpose of the *Edwards* rule was fulfilled. That may be true. However, the *Edwards* rule acts as a "clear and unequivocal" guideline to law enforcement precisely because it is "relatively rigid." *See Arizona v. Roberson,* 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). When a person subjected to custodial interrogation unambiguously invokes the right to counsel, all questioning must cease. Interrogation may not be reinitiated by the police[6] at any time or in any manner unless the person has consulted counsel. *Id.* at 681–82. Period.

The State also argues that Detective Bishop did not know that appellant had invoked her right to counsel. Whether or not Stallings informed Bishop of appellant's invocation of her right to counsel is irrelevant because courts impute knowledge of the invocation of any *Miranda* rights to all representatives of the State. *See Michigan v. Jackson,* 475 U.S. 625,

money. The jambox was sold to an individual at the Mexican dude on Fitzhugh & East Grand. I got a ride with a male & female. We went to several gas stations & she went inside to use the credit cards once or twice.

5. The Supreme Court recently declined to modify or jettison the *Miranda* rule, *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). In *Dickerson,* Chief Justice Rehnquist, speaking for the Court, rejected the very rule that the State requests us to adopt in this case: that a defendant's custodial statement should be admissible if, under the totality of circumstances, the court finds that the statement was given voluntarily and without mental or physical coercion, regardless of whether the defendant has been given *Miranda* warnings and invoked his right to consult an attorney. *Id.* at 2336.

6. Of course, if the arrestee reinitiates the conversation, the *Edwards* rule is satisfied.

634, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Sterling v. State,* 800 S.W.2d 513, 520 (Tex. Crim.App.1990). Moreover, Stallings' sworn testimony revealed that he informed Bishop that appellant invoked her right to counsel and that Stallings ceased his interrogation of appellant after that invocation.

In sum, the *Edwards* rule does not take into account the good intentions of the individual police officer, the lack of official coercion or badgering in the particular case, or the actual voluntariness of a person's custodial statement. *Edwards* represents a bright and firm constitutional rule that applies to all suspects and all law enforcement officers. We hold, therefore, that the trial court erred in admitting appellant's statement into evidence.

### III.

■ We must now determine whether this error harmed appellant. Texas Rule of Appellate Procedure 44.2(a) provides that where, as here, the appellate record in a criminal case reveals constitutional error, we must reverse a judgment of conviction or punishment unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* TEX.R.APP.P. 44.2(a). We begin by reviewing the trial record to determine how the State used appellant's statement against her.

We first note that the State offered ample evidence of appellant's guilt from sources independent of her statement. Dr. Booth's daughter testified that, six months prior to her death, Dr. Booth told her that "the black lady that lived across the alley" called her in the middle of the night and asked to borrow money. The victim's caller ID records showed that she received two calls from an anonymous number on July 22, 1997, at 6:19 a.m. and 6:29 a.m. Harry Wilkins, Jr., aka, "Smiley," testified that appellant was driving

the victim's white Mercedes Benz station wagon when she met him on the morning of July 22, 1997, to inquire about buying crack cocaine. The State further showed that appellant pawned the victim's diamond ring on July 22, 1997, and that she used the victim's credit cards at several locations on July 23, 1997. When appellant was arrested on July 24, 1997, she attempted to take with her a tote bag containing the victim's driver's license and several of the victim's credit cards. The State's strongest independent evidence of appellant's guilt was produced when the police executed a search warrant at appellant's home on July 24, 1997. Officers found a large knife stained with Dr. Booth's blood in appellant's kitchen cabinet above the refrigerator. The bloody knife matched other knives found in the kitchen drawers of appellant's house.

Nevertheless, the State relied on appellant's statement extensively, both during its case-in-chief and during its closing arguments. Initially, the State used the statement to set up appellant's version of what happened on the early morning of July 21, 1997. The State used the statement to discredit appellant's version of events as compared to the State's principle theory of the case—that appellant acted alone in the murder and robbery of Dorothy Booth. For example, during direct-examination of Bishop, the State asked him if appellant included in her statement a way for the State to further identify "Kilo and J.C." or find them. Bishop responded in the negative, casting doubt on whether "Kilo and J.C." even existed. During its closing argument at guilt/innocence, the State rhetorically asked the jury: if there really were a "Kilo and J.C.," why would they hide the murder weapon in appellant's kitchen cabinet? The State also questioned why "Kilo and J.C." left appellant alone in the victim's car

with all of the stolen property while they went inside a crack house to negotiate the purchase of drugs.

Additionally, the State made significant use of this statement to establish appellant's guilt for the capital murder of Dr. Booth. The State admitted the statement through the testimony of its last witness during its case-in-chief, as the last exhibit placed before the jury for its consideration. The State used the statement during the presentation of its case to prove that appellant knew Dr. Booth and called her on the morning of the offense to make sure Dr. Booth was home and awake. Even though appellant tried to lay blame for the robbery on "Kilo and J.C.," the State used the statement to show that appellant was aware that "Kilo and J.C." planned to rob Dr. Booth. Bishop also testified that appellant never said in her statement that she left, or tried to leave, to call the police during any of the times that "Kilo and J.C. left her alone in the car." Instead, the statement showed that appellant remained at the scene of the crime for three to five minutes. The State, during its direct examination of Bishop, demonstrated to the jury the length of a five minute period by having Bishop sit silently on the witness stand while the prosecutor let five minutes tick off of his watch. After this, the State allowed Bishop to reiterate that appellant never tried to leave the scene to get help from anyone.

The State also used appellant's statement during its case-in-chief to show how her post-offense behavior indicated her guilt. The State used the statement to place evidence of flight from the police before the jury. Specifically, during her account of the attempt to trade Dr. Booth's property to "Smiley" for drugs, appellant states that the police stopped "Smiley" in the victim's car in front of "Smiley's" house. In her statement, appellant recounted how she ran out the back door of "Smiley's" house and hid before returning to get the car keys back from "Smiley."

Appellant's statement was used in the State's examination of Bishop to point out several obvious falsehoods made by appellant. Toward the end of Bishop's testimony, the State questioned Bishop regarding appellant's oral comments. After her statement was written and signed, appellant told Bishop that portions of her statement were not true. According to Bishop, appellant then told him:

That she would tell the truth. Number one, she didn't want to get the death penalty; and, number two, if she was going to get the death penalty, that if she can get just one rock of cocaine, then she would tell the truth, but she wanted to get one rock of cocaine before she died.

The State then passed Bishop to appellant for cross-examination.

Lastly, the State relied extensively on appellant's statement during its closing arguments to the jury at guilt/innocence. Appellant's inadmissible statement became the rhetorical strawman that the State effectively decimated. The State made no less than ten references to appellant's statement in its arguments. The State referred to the statement as proof that it was appellant who called Dr. Booth on the morning of the murder. It pointed out in argument that appellant went to Dr. Booth's door to get sugar in order to get Dr. Booth to open her door. The State argued that it eliminated its first suspect, "Smiley," from suspicion in the murder of Dr. Booth because appellant explained in her statement that she allowed "Smiley" to borrow Dr. Booth's car for a few hours in exchange for drugs. The State used appellant's statement to remind the jury that appellant ran from the police at "Smiley's"

house "to avoid detection for this offense." The State pointed to appellant's statement as proof that appellant had possession of Dr. Booth's property and converted it to cash to buy drugs.

During its final closing argument in rebuttal, the State again relied on appellant's statement, citing it as direct evidence of her guilt. First, the State argued that "Kilo and J.C." existed only in appellant's statement. The State asked the jury if it made sense to it that "Kilo and J.C." would want property so badly that they would kill Dr. Booth, take her property, go to south Dallas, leave appellant with all of this stolen property, and walk away. The attorney for the State then argued before the jury,

> [STATE]: Now, let's assume just for the moment there was this alleged Kilo and J.C. Let's assume that. Let me show you the ways you can find her guilty.
>
> One, you can find her guilty as being the one who actually killed Ms. Booth and took her property.
>
> Two, you can find her guilty as to what they call a party. If acting with intent to promote or assist in the commission of the offense, okay, she then solicits, encourages or aids J.C. and Kilo. In her own statement she called— she called them, she aided them, she

walked over there. It was because of her Ms. Booth opened the door and said, sure, you can find them as a party on that portion.

> There is a third portion you can find her guilty for capital murder on. That's called a conspiracy theory. Okay?
>
> What are we talking about when we talk about conspiracy.
>
> Well if people conspire to commit one offense and another offense is committed by one of the conspirators actions, then all conspirators are guilty of the offense committed.
>
> So even if you take her statement, okay, and she talks with them, that's conspiring with them about committing a robbery and she aids them, we know that, and either one of those alleged people goes in and kills Ms. Booth, then she can be convicted on conspiracy theory, theory number 3, okay, three ways you can convict.

The trial court instructed the jury on the law of parties and the law of conspiracy in the abstract. The trial court also instructed the jury on the law of parties in the second alternative application paragraph, and on the law of conspiracy on the third alternative application paragraph. Thus, the State used appellant's statement as direct evidence of her guilt as a party or co-conspirator.[7]

---

7. Later in its closing argument, the State again used appellant's statement as further proof of her guilt as a party or co-conspirator:

> [STATE]: She waited outside the victim's house in a car for several minutes. Here's a person whose life has been threatened and these friendly killers leave her outside in the car unguarded, doesn't go to the police, doesn't run for help, doesn't call anybody.
>
> Does that make sense to you?
>
> That's the first wait.
>
> What about the second wait?
>
> She waited outside while the alleged killers went in her house. Just wait. Let's wait for the killer. See?

> Does that make any sense to you? You wait outside, doesn't run away, your life is supposed to be threatened?
>
> No, it doesn't.
>
> Three, the third wait. She waited in the car with the keys, we know, about a block off of Second Avenue for three to five minutes.
>
> Folks, common sense that there was—if there was a real Kilo and J.C., you hang around knowing that these are the type of people that can kill and you just wait on them?
>
> No, that's not true.

The State also asked the jury to look to appellant's statement to find her motive for committing the capital murder of Dr. Booth.

[STATE]: On the TV you hear the words sometimes motive, means and opportunities. We are not required to prove motive, but I want to cover those with you to show how we put the facts of the together.

Motive, financial problems, wanted crack. We know that even from her own statement. Okay?

Lastly, the prosecutor used appellant's statement to help explain the murder weapon.

[STATE]: Think about this, Folks. In her statement—here's where the truth rings. In her statement she never ever mentions the knife. What did they threaten her with if they did? Never mentions a knife. She never mentions them picking it up taking it out of the house. These are dope dealers. What did they need to get a knife for?

She never mentions them taking it back to her house. She never once mentions the knife.

Why?

Because the knife is what ties her into the crime.

■ In analyzing whether the constitutionally erroneous admission of a defendant's statement was harmless, we look first to *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). In *Satterwhite*, the Supreme Court emphasized that the decision on harmlessness was not determined solely on the basis of whether there was sufficient evidence, independent of the defendant's inadmissible statement, for a reasonable jury to reach the same conclusion which it had reached with the statement.

The Court of Criminal Appeals thought that the admission of [the tainted] testimony on this critical issue was harmless because the "properly admitted evidence was such that the minds of the average jury would have found the State's case (on future dangerousness) sufficient ... even if the testimony had not been admitted." The question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."

486 U.S. at 258–59, 108 S.Ct. 1792. The principle set out in *Satterwhite* still applies to this Court's review of harm in the admission of appellant's statement into evidence because this is federal constitutional error under Tex.R.App. P. 44.2(a). We must review whether the admission of appellant's statement contributed to the jury's verdict of guilty in this cause, regardless of whether there is evidence independent of the statement that is otherwise sufficient to sustain the jury's verdict of guilt.

■ "An appellate court should not focus on the propriety of the outcome of the trial." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex.Crim.App.2000). If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt. *See Satterwhite*, 486 U.S. at 256–257; *Wesbrook*, 29 S.W.3d at 119. The reviewing court should calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence. *See Wesbrook*, 29 S.W.3d at 119.

A defendant's statement, especially a statement implicating her in the commission of the charged offense, is unlike any

other evidence that can be admitted against the defendant. *See Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In *Fulminante,* the defendant was convicted through the use of a statement obtained in violation of his Fifth and Fourteenth Amendment rights. *See id.* at 287–88, 111 S.Ct. 1246. The Supreme Court noted that

> [A] defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. ... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

*See id.* at 296, 111 S.Ct. 1246. In this case, appellant's statement did not place the murder weapon in her own hands, as the defendant's confession did in *Fulminante.* But her statement was, as the State's attorney so effectively pointed out in his closing argument, powerful enough to establish her guilt of capital murder either as a party or as a conspirator. It was also used to paint appellant as an unrepentant liar and set out her cruel and greedy motive for killing her elderly neighbor.

A confession is likely to leave an indelible impact on a jury. "If the jury believes that a defendant has admitted the crime, it will doubtless be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case. Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence." *Fulminante,* 499 U.S. at 313, 111 S.Ct. 1246 (Kennedy, J., concurring).

Regardless of whether there was, apart from appellant's statement, sufficient evidence to conclude that the outcome of the trial was proper, we find it impossible to say there is no reasonable likelihood that the State's use of appellant's statement materially affected the jury's deliberations. *See Wesbrook,* 29 S.W.3d at 119; *Garcia v. State,* 919 S.W.2d 370, 380 (Tex. Crim.App.1994). We cannot conclude, beyond a reasonable doubt, that the admission of appellant's unconstitutionally obtained statement did not contribute to the jury's verdict of guilty.

Although we are slow to overturn the verdict of a jury, when fundamental constitutional protections are violated, however innocently, we must uphold the integrity of that law. Accordingly, we sustain appellant's first point of error.[8] We reverse the judgment of the trial court and remand this cause to that court for a new trial.

KELLER, P.J., filed a dissenting opinion in which HERVEY, J., joined.

KEASLER, J., not participating.

KELLER, P.J., filed a dissenting opinion in which HERVEY, J., joined.

If appellant's statement were truly a confession, in the sense that in it appellant admitted that she murdered Mrs. Booth, I would agree with the Court that its admission harmed appellant. Questions of harm and of the applicability of cases dealing with the improper admission of confessions are complicated, however, by the fact that when appellant gave her voluntary state-

---

8. Because we reverse the judgment on the basis of *Edwards* error, the other issues appel-

lant raises are moot.

ment to Detective Bishop, she meant it to be exculpatory. And it was exculpatory. If the jury had believed what appellant said in her statement, the jury could have decided that appellant acted under duress on the morning of the murder and that she was not guilty of any crime at all. The introduction of the statement provided the jury with an option that did not exist in the absence of the statement.

In fact, and not surprisingly, appellant fashioned her defense around the statement. Max Courtney, director of a crime lab, testified that he was furnished photographs, witness statements, police statements, prosecution reports, autopsy reports, and more. From those items, he determined that nothing in the physical evidence at the murder scene was inconsistent with appellant's statement to Detective Bishop. Courtney further testified that the physical evidence at the murder scene appeared to be consistent with two different pairs of shoes leaving marks in the entryway, and with a bloody knife mark that did not match the knife found in appellant's house.

Because of the admission of appellant's statement, the trial court included in the jury charge an instruction on duress. Defense counsel was also able to argue duress to the jury, contending that appellant was coerced into helping Kilo and J.C. and that her statement was consistent with the evidence.

The defense of duress, and Max Courtney's testimony backing up the story in the statement, were available to appellant because her statement was admitted at trial. It is true that appellant was stuck with that particular defense once the statement was admitted, but she got the benefit of having the defensive theory she herself devised placed before the jury without having to testify. Moreover, if she had testified to facts inconsistent with the Kilo–J.C. duress story, the State could have introduced the statement to impeach her credibility.[1] Appellant's options became limited the moment she gave the statement, regardless of whether the State introduced it during its case-in-chief. The possibility of raising an actual defense other than duress was, to all intents and purposes, foreclosed by the State's ability to use appellant's statement for impeachment.

Setting aside consideration of the statement, there was abundant evidence that appellant killed Mrs. Booth. Appellant was seen driving Mrs. Booth's car within about an hour of the murder. Appellant pawned Mrs. Booth's ring that same day. Appellant used Mrs. Booth's credit cards several times and had the credit cards and Mrs. Booth's driver's license when arrested. Police found a large knife, cleaned but stained with Mrs. Booth's blood, in appellant's kitchen cabinet. The knife matched others found in appellant's kitchen.

The ultimate question is whether the admission of the statement contributed to appellant's conviction or punishment.[2] The Kilo–J.C. story offered an explanation for all of the above evidence, to one extent or another. Without the Kilo–J.C. story, there was no explanation. And because the Kilo–J.C. story was available for impeachment purposes, appellant was limited in her ability to propose a different defense to the jury.

The evidence that fit least well with the Kilo–J.C. story was the evidence that was

1.  Mincey v. Arizona, 437 U.S. 385, 397–398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).

2.  Tex.R.App. P. 44.2(a).

also, absent the story, most incriminating, namely: the knife. The appearance of what was apparently one of appellant's own knives, cleaned, in her kitchen cabinet, with the victim's blood under the handle, is consistent with the Kilo–J.C. story because according to the story, the two men were at appellant's house both before and after the murder. Counsel suggested in argument that the men took the knife and then after the murder put it in the cabinet to incriminate appellant. In the absence of the Kilo–J.C. story, there is no explanation at all for the presence of the bloody knife in appellant's kitchen cabinet. The Kilo–J.C. story offers an explanation for the other evidence, such as appellant's possession of Mrs. Booth's car, credit cards, and ring. It may or may not be a very good explanation, and in fact the jury rejected it. But it was better than no explanation, which is what appellant had absent the admission of the statement.

The State used appellant's statement to argue that she was a liar. Showing a defendant to be a liar could establish harm. But in this case, the very same evidence that tended to show appellant was a liar was the evidence that tended to show she was a murderer. If the jury believed that the presence of the knife in appellant's kitchen, for instance, showed that appellant lied about Kilo and J.C., then the jury also believed that appellant had the murder weapon hidden in her kitchen cabinet, with no explanation for it being there.

The State also used appellant's statement to put her at Mrs. Booth's house the morning of the murder. But appellant's possession of the victim's car and other property shortly after the murder ties her to the murder anyway. Her statement at least attempted to explain that possession in a manner consistent with innocence. Absent the statement, there was no explanation. Her statement was buttressed by Max Courtney's testimony about two possible different shoe prints and a possible different knife, and supported by his claim that everything appellant said beginning with "I called my neighbor Dorothy Booth" to "both guys went back into my house and came out with my jam box, cordless phone and caller ID" was consistent with the physical evidence at the murder scene.

The State argued to the jury that it could find appellant guilty of capital murder even if it believed her story about Kilo and J.C., by convicting her as a party or as a conspirator. But that is not true unless the jury disbelieved the claim of duress. Of course, the jury could believe one part of the statement and disbelieve other parts, but if the jury had believed all of it, appellant would have been acquitted. Even if the jury believed only part of the statement, appellant was still no worse off than she would have been with no defensive theory at all, or with whatever defensive theory counsel could suggest in argument.

Given the extremely damaging evidence against appellant, and the fact that the statement put before the jury appellant's explanation for the evidence and her claim of innocence, and the fact that making the statement limited her options regardless of whether it was introduced in the State's case-in-chief, I would hold that appellant was not harmed by the admission of the statement.