**John Kevin BENOIT, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 04–01–00035–CR.

Court of Appeals of Texas,
San Antonio.

July 3, 2002.

Discretionary Review Refused
Oct. 23, 2002.

Brian W. Wice, Houston, for appellant.

Charles A. Rosenthal, Jr., District Attorney, Donald W. Rogers, Jr., Assistant District Attorney, Houston, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice CATHERINE STONE, Justice SANDEE BRYAN MARION, Justice.

Opinion by: SANDEE BRYAN MARION, Justice.

A jury found defendant, John Kevin Benoit, guilty of murder and sentenced him to life in prison. The defendant does not challenge the sufficiency of the evidence; instead, he raises six procedural complaints, including whether his Fifth Amendment right to counsel was violated. We conclude that defendant's written statement was obtained in violation of his Fifth Amendment right to counsel and this error was harmful; therefore, we reverse and remand.

### ALLEGED USE OF ILLEGAL WIRETAP

In issue one, the defendant asserts the trial court erred in denying his motion for mistrial after evidence of a recorded conversation between himself and an attorney was introduced at trial.

A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Ladd v. State,* 3 S.W.3d 547, 567 (Tex. Crim.App.1999). Thus, a trial court may properly exercise its discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error. *Sewell v. State,* 696 S.W.2d 559, 560 (Tex.Crim.App.1983). The determination of whether a given error necessitates a mistrial must be made by examining the particular facts and circumstances of the case. *Hernandez v. State,* 805 S.W.2d 409, 414 (Tex.Crim.App.1990). A trial court's denial of a mistrial is reviewed under an abuse of discretion standard. *State v. Gonzalez,* 855 S.W.2d 692, 696 (Tex.Crim. App.1993).

The error about which defendant complains arose during testimony by La Porte Police Detective Danny Jones. Jones testified that he first spoke to the defendant on February 16, 1999 at the police station. While Jones was talking to the defendant, Jones received a telephone call from Walter Mahoney, who identified himself as an attorney. Jones spoke briefly with Mahoney, and then he allowed the defendant to speak with Mahoney. During cross-examination, Jones said the conversation between Mahoney and the defendant had been recorded by the La Porte Police Department. Defense counsel asked Jones whether the taping was illegal, and the State objected. After the trial court sustained the objection, defense counsel argued that, because the State had opened the door on the recorded conversation, he should be allowed to show how, by whom, and for what purpose the tape had been obtained. The trial court disagreed, and held a hearing outside the jury's presence to consider the issue.

At the hearing, defense counsel also complained that Jones had used the tape transcript to refresh his memory before trial. When the court asked Jones if he read the transcript before trial, Jones replied, "I saw the transcript. I may have read one page of it and that was it. I have not read the entire transcript whatsoever. And the only part I did read was the beginning, just mine and Mr. Mahoney's part and that was it." Jones also said he wrote in his offense report that he spoke to Mahoney, and he used his offense report to refresh his memory at trial. He said that what he read in the transcript and what he wrote in his report was essentially the same information.

The court ordered the State and defense not to mention the tape, its existence or contents, directly or indirectly at trial, and it instructed the jury as follows:

> I am instructing you that you are to disregard and not consider for any purpose any testimony, any questioning, anything that you might have heard up to this point in the trial regarding a tape recording or a recording of a conversation between Detective Jones and Walter Mahoney or the existence of a transcript. That you are to disregard that, the existence of the tape or transcript. You are to disregard that and not consider it for any purpose in making any decision in this case.

The defendant moved for a mistrial, which the court denied.

Although the contents of the tape and the transcript were not offered or admitted at trial, on appeal, the defendant complains that because Jones used the transcript to refresh his memory prior to testifying and the recording was mentioned during trial, his substantial rights were harmed by this "use" of the wiretap, and the trial court's instruction was not

sufficient to cure the harm. However, improper evidence will seldom call for a mistrial, because in most cases any harm can be cured by an instruction to disregard. *Ladd,* 3 S.W.3d at 567; *Hernandez,* 805 S.W.2d at 413–14. An instruction to disregard normally cures error, except in extreme cases where the evidence is clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on the jurors' minds. *Ladd,* 3 S.W.3d at 567; *Livingston v. State,* 739 S.W.2d 311, 335 (Tex.Crim.App.1987); *Carter v. State,* 614 S.W.2d 821, 824–25 (Tex.Crim.App. [Panel Op.] 1981).

■ Jones's testimony revealed to the jury only that Mahoney called the police station, spoke with both Jones and the defendant, and the conversations were taped. The content of the conversations was not revealed or alluded to. Accordingly, we conclude that the instruction cured any error in admitting testimony about the recorded conversations, and the testimony was not so inflammatory as to be incurable by an instruction to disregard; therefore, the trial court did not abuse its discretion in denying the motion for mistrial.

## MISCONDUCT OF POLICE DEPARTMENT

In his second issue, the defendant asserts the trial court erred in refusing to permit him to introduce evidence of misconduct by the La Porte Police Department resulting from its illegal wiretap. He contends that evidence of the illegal recording was relevant because the jury was entitled to know the circumstances surrounding the manner in which the defendant gave his statement, and he was entitled to elicit the testimony as part of a meaningful defense.

■ We review a trial court's admission or exclusion of evidence under an abuse of discretion standard. *Salazar v. State,* 38 S.W.3d 141, 153–54 (Tex.Crim. App.2001). If the trial court's decision to exclude evidence is correct on any theory of law applicable to the case, it will be sustained. *Smith v. State,* 898 S.W.2d 838, 843 (Tex.Crim.App.1995).

■ The defendant does not explain how testimony that the La Porte Police Department was recording telephone conversations affected the voluntariness of his statement. Nor does he explain how the exclusion of such testimony impacted his ability to present a meaningful defense. Therefore, the defendant has not shown the trial court abused its discretion in excluding evidence of the police department's misconduct.

## EXCLUSION OF RANDALL ELKINS'S TESTIMONY

In his fifth issue, the defendant asserts the trial court erred in excluding testimony that would have corrected a false impression created by Randall Elkins, the State's witness. Immediately after introducing Elkins to the jury, the prosecutor elicited testimony from Elkins that he had been convicted of indecency with a child in 1999. Elkins then explained what happened the night of the murder and how he helped the defendant dispose of the body. After disposing of the body, Elkins said

[The defendant] wiped it [the truck's tailgate] off, threw the rag into the dumpster and he came back to where I was and I said I'm going in. And he told me—he said, "Well, don't tell anyone what happened." And I said, "Don't worry man." [The defendant then said] "Because I know where your family lives."

. . .

I don't know which family he was talking about, but I thought he was talking about my wife and kids.

On cross-examination, in an attempt to discredit Elkins's allegation that defendant threatened his family, defense counsel sought to establish that Elkins's step-daughter lived with him, and the step-daughter had been the complainant in the child indecency case. When the State objected to the relevancy of such testimony, the defendant argued that he was entitled to show that Elkins was lying about perceiving a threat to his step-daughter. The trial court sustained the objection.

■ On appeal, defendant asserts Elkins's testimony was admissible under Texas Rules of Evidence 401 and 611(b) as relevant to Elkins's credibility. Rule 401 provides that relevant evidence is that evidence which has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. TEX.R. EVID. 401. Rule 611 provides that a witness may be cross-examined on any issue, including credibility. TEX.R. EVID. 611(b). In deciding whether evidence is relevant, a trial court should ask whether a reasonable person, with some experience in the real world, would believe the evidence is helpful in determining the truth or falsity of any fact that is of consequence to the lawsuit. *Montgomery v. State*, 810 S.W.2d 372, 376 (Tex.Crim. App.1991) (op. on reh'g).

■ Although a defendant's right to confrontation and cross-examination is constitutionally safeguarded, the right is not absolute. *Huff v. State*, 897 S.W.2d 829, 839 (Tex.App.-Dallas 1995, pet. ref'd). The trial court retains great latitude in imposing reasonable limitations on cross-examination. *Virts v. State*, 739 S.W.2d 25, 28 (Tex.Crim.App.1987). The court may properly limit the scope of cross-examination to prevent harassment, prejudice, confusion of the issues, harm to the witness, and repetitive or marginally relevant interrogation. *Carroll v. State*, 916 S.W.2d 494, 498 (Tex.Crim.App.1996). When considering whether a trial court's decision to exclude testimony is error, we must determine whether the trial court abused its discretion. *Love v. State*, 861 S.W.2d 899, 903 (Tex.Crim.App.1993). This inquiry depends on the facts of each case. *Id.*

We hold that the trial court did not abuse its discretion in excluding testimony that a member of Elkins's family was a complainant against him in the child indecency case.

## PUNISHMENT PHASE JURY INSTRUCTION

■ In issue six, the defendant contends it was error to give the parole law instruction mandated by the Texas Code of Criminal Procedure during the punishment phase, because he was not eligible for a reduction in time while serving a prison sentence for murder. *See* TEXAS CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (Vernon Supp.2002). After submission of this appeal, the Court of Criminal Appeals considered and rejected the same argument in *Luquis v. State*, 72 S.W.3d 355 (Tex.Crim. App.2002). The *Luquis* Court held that "because the trial judge ... instructed the jury according to legislative dictate expressed in article 37.07, section 4(a), he did not commit error." *Id.* at 363. The Court also held that the instruction was not so misleading as to deny defendant due process. *Id.* at 368. Based on the holding in *Luquis,* we conclude the trial court here did not err in giving the parole law instruction to the jury.

## VIOLATION OF RIGHT TO COUNSEL

■ In issue three, the defendant asserts the trial court erred in denying his

motion to suppress his written statement because the statement was taken after he invoked his right to counsel, but before he had the opportunity to speak with an attorney.[1] The defendant contends his Fifth and Sixth Amendment rights to counsel were violated because he was interrogated after he unequivocally invoked his right to counsel on February 16th and Jones did not ensure he had an attorney before he signed his statement on February 17th. Because the defendant did not object to the admissibility of his statement on the basis of the Sixth Amendment's right to counsel, he waived review of that claim on appeal. Therefore, we address only the defendant's Fifth Amendment complaint.

Jones first interrogated the defendant at the police station on February 16th, starting at about 11:50 a.m., after the defendant received his *Miranda* warnings from a magistrate and again from Jones. Jones and the defendant spoke for about an hour to an hour and a half, after which time, the defendant's statement was reduced to writing. While the defendant was reading his statement, but before he signed it, Mahoney called the police station because the defendant's mother had asked him the call the station to find out what was happening. Mahoney first spoke to Jones, and he told Jones he was an attorney who had been contacted by the defendant's mother. Jones said Mahoney did not tell him the defendant had retained him; rather, Jones said Mahoney called only to find out what was happening with the defendant. Jones told Mahoney the defendant had received his *Miranda* warnings and that he had given a statement, but not yet signed it. Jones then allowed Mahoney to speak with the defendant.

After speaking with Mahoney, the defendant told Jones that everything in his statement was true, but "he would not sign anything until his attorney arrived." Jones said he stopped the interrogation, not because he was asked to, but because the interview was complete. Jones testified that the defendant never asked for an attorney during questioning. Jones allowed the defendant to wait in his office for about thirty minutes, because Mahoney had said he was on his way to the police station. When Mahoney still had not arrived by about 3:00 p.m., the defendant was taken to a holding cell.

Jones and the defendant did not speak again until February 17th, at about 1:00 p.m., when the defendant was taken from his cell for a physical examination and to be photographed. Jones said they photographed the defendant because the defendant had said he was in a fight with the victim, and the police wanted pictures of the defendant's injuries. After the examination, Jones told the defendant that Mahoney never arrived at the police station. Defendant responded that he did not have the money to hire Mahoney. Jones told defendant not to say anything else and he informed him that he did not have to speak with a detective or any officer about the

---

1. In issue four, the defendant asserts that the trial court's failure to make adequate written findings of fact has infringed upon his constitutional right to a fair review of his complaint in issue three. The trial court issued forty-one findings of fact and four conclusions of law on whether the defendant's statement was voluntary. The defendant contends these findings are inadequate because they do not address (1) his invocation of his right to counsel, (2) his contention that he did not reiniti-ate contact with the police after he spoke to Mahoney, and (3) Jones's use of a psychological ploy to get him to change his statement. Having reviewed the court's findings in light of the record, we believe that they are adequate to insure a reliable and clear-cut determination of the voluntariness of the defendant's confession, including the resolution of the disputed facts upon which the voluntariness may depend.

offense. Jones also told the defendant that he did not think the defendant had been truthful with him based on statements from other witnesses and evidence the police had gathered. The defendant then asked what was going to happen to him, and Jones told the defendant what he knew about the case.

Jones then testified as follows: "At that point in time I believe[d] he did not have an attorney. He had just told me he did not have an attorney. And I asked him if he wanted to change his initial statement and I went on and warned him that if he wanted to contact an attorney, he could do so and that attorney could be present prior to and during any questioning." Jones said he told the defendant that he (Jones) would not promise anything, that murder charges would probably be filed against him, and that it was his decision to speak further with a detective. The defendant agreed to talk to Jones because he wanted to tell the truth. Jones again gave the defendant his *Miranda* warnings. The defendant gave Jones another statement, which was reduced to writing and signed by the defendant.

Jones admitted that between the two conversations, on February 16th and 17th, the defendant did not call Jones, send a message to Jones, or initiate any conversation leading Jones to believe the defendant wanted to change his statement. The defendant asserts that Jones was not free to reinitiate an interrogation with him on February 17th because he unequivocally invoked his right to counsel on February 16th when he told Jones he would not sign anything until after his lawyer arrived. At oral argument, the State conceded that the defendant did not reinitiate conversation on February 17th, and if the defendant unequivocally asserted his right to counsel on February 16th, then no interrogation should have occurred on February 17th.

We agree; therefore, the issue before us is whether the defendant unequivocally asserted his right to counsel on February 16th.

■■■■■ Once a suspect asserts his right to counsel, all interrogation by the police must cease until counsel is provided or until the suspect himself reinitiates conversation. *Dinkins v. State,* 894 S.W.2d 330, 350 (Tex.Crim.App.1995). A suspect has invoked his right to counsel when he indicates he wishes to speak to an attorney or have an attorney present during questioning. *Id.* at 351; *Lucas v. State,* 791 S.W.2d 35, 45 (Tex.Crim.App.1989). An invocation must be clear and unambiguous; the mere mention of the word "attorney" or "lawyer" without more, does not automatically invoke the right to counsel. *Dinkins,* 894 S.W.2d at 351; *Lucas,* 791 S.W.2d at 45–46. When reviewing alleged invocations of the right to counsel, we typically look at the totality of the circumstances surrounding the interrogation, as well as the alleged invocation, in order to determine whether a suspect's statement can be construed as an actual invocation of his right to counsel. *Dinkins,* 894 S.W.2d at 351; *Lucas,* 791 S.W.2d at 45–46.

■■■■■ Here, the defendant's statement to Jones, after speaking with Mahoney on the telephone on February 16th, that he would not sign anything until his attorney arrived was a clear and unambiguous invocation of his right to counsel. Thus, the police were not entitled to initiate an interrogation on February 17th, and the trial court erred in denying the defendant's motion to suppress. We next determine whether the error was harmless.

■■■■■ Because the appellate record here reveals constitutional error, we must reverse the judgment of conviction or punishment unless we determine beyond a reasonable doubt that the error did not

contribute to the conviction or punishment. *See* TEX.R.APP. P. 44.2(a); *McCarthy v. State,* 65 S.W.3d 47, 52 (Tex.Crim.App. 2001). Harmlessness is not determined solely on the basis of whether there was sufficient evidence, independent of the defendant's inadmissible statement, upon which a reasonable jury could reach the same conclusion that it had reached with the statement. *See Satterwhite v. Texas,* 486 U.S. 249, 258–59, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *McCarthy,* 65 S.W.3d at 55. We also review the record to determine whether the admission of the defendant's statement contributed to the jury's verdict of guilty, regardless of whether there is evidence independent of the statement that is otherwise sufficient to sustain the jury's verdict of guilt. *McCarthy,* 65 S.W.3d at 55. In such a review, we do not focus on the propriety of the outcome of the trial. *Id.; Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex.Crim.App.2000). If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt. *McCarthy,* 65 S.W.3d at 55; *Wesbrook,* 29 S.W.3d at 119. We must determine, as nearly as possible, the probable impact of the error on the jury in light of the other evidence. *McCarthy,* 65 S.W.3d at 55; *Wesbrook,* 29 S.W.3d at 119.

During its case-in-chief, the State offered the defendant's statement, as well as the testimony of several witnesses. In the defendant's statement, he claimed that while the victim, Johthana Haney, was attacking him, Elkins came into the room with a bat and started hitting Haney, while Haney was standing. Defendant said Haney would not stop fighting, and when he went after Elkins, defendant picked up the bat, which Elkins had dropped, and hit Haney. The defendant said he "f-king hit him in the head or side of the face. I hit him about twice but it did not seem to phase him, he was still fighting but bleeding a lot at this time."

During the State's case-in-chief, Elkins testified that he, the defendant, and Haney smoked crack cocaine together at the defendant's house. Elkins said the defendant later went to the bedroom where Haney was sleeping to ask Haney for more crack, promising to pay him the next day. At some point later, the defendant called Elkins to the bedroom, and said "I need you to back me up." The defendant then hit Haney several times with a baseball bat. Elkins helped the defendant dispose of Haney's body. Other witnesses testified about what defendant told them. Defendant told his neighbors that a black man broke into his house and he hit the man with a pool cue. The defendant's mother testified that her son told her that a black man broke into the house, he chased the man, hit him with a bat, and then gave the bat to five white guys in a truck who drove off after the black man. He told a friend a man broke into the house, and he hit the man once with a bat. This friend said she overheard defendant tell another person that he had hit someone with a bat and defendant said "he was trying to hit a home run." Forensic evidence showed that Haney had been laying down when he was hit.

In closing arguments, defense counsel relied on defendant's statement in which the defendant said that Elkins was the one who beat Haney with the bat. During his closing, the prosecutor contrasted the defense's theory that Elkins beat Haney against the various conflicting stories that defendant told his mother, friend, and neighbors. The prosecutor argued that Elkins was telling the truth and the defendant's statement was a lie.

In *McCarthy,* the Court of Criminal Appeals held that the admission into evidence

of the defendant's statement, which was taken in violation of her right to counsel, was harmful even though the Court noted that the State offered ample evidence of the defendant's guilt from sources independent of her statement. In *McCarthy,* the State relied on the defendant's statement during its case-in-chief and closing arguments. Although the defendant's statement here was not used as extensively as that in *McCarthy,* its use here was just as damaging. The defendant's statement placed the bat in his own hands, establishing that he hit Haney twice, and confirming his guilt as either the principal or as a party.[2] We cannot conclude, beyond a reasonable doubt, that the defendant's statement did not contribute to the jury's verdict of guilt; therefore, we hold that the admission of the statement was not harmless beyond a reasonable doubt. *See McCarthy,* 65 S.W.3d at 56. Accordingly, we reverse the judgment of the trial court and remand this case to the trial court for a new trial.

2. The jury was instructed that it could find defendant guilty of murder either as a principal or as a party, or guilty of aggravated assault.