TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-05-00038-CR






Mark Tillman, Appellant


v.


The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT

NO. 5040095, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N



 Appellant Mark Tillman was convicted of murder. See Tex. Pen. Code Ann. § 19.02
(West 2003). In two issues on appeal, Tillman asserts that the district court erred in admitting
evidence that it had previously ordered suppressed, and that the evidence is legally and factually
insufficient to sustain his conviction. We will affirm the judgment of the district court. 

BACKGROUND

 The jury heard evidence that, on the morning of March 2, 2004, Porfirio Jaimes
discovered the body of Elroy McBride on his property, where McBride had been living in a mobile
home. Jaimes recounted that blood was pooled around McBride's head. Jaimes notified the
authorities, and Deputy Keith Mutscher and Detectives Robert Speer and Rudy Woods of the Travis
County Sheriff's Office went to the property to investigate. Deputy Mutscher testified that
McBride's body was located in a "tent-like" structure and covered under an "Indian or Mexican style
blanket." Blood was splattered on the structure. A two-bladed axe, coated with blood and hair, was
discovered near the body. 

 Detective Speer testified that Jaimes told him that he had seen a truck on the property
the previous night, and that this truck was now parked "up the street on the corner." The officers and
Jaimes went to the location where the truck was parked, which was in the street in front of a travel
trailer. Speer testified that "within a matter of minutes" they were approached by Mark Tillman,
who identified himself and verified that the truck belonged to him. Detective Woods testified that
he did not see any evidence of bruises or injuries on Tillman. Woods testified that he asked Tillman
if he knew Elroy McBride, and Tillman responded that he did. Woods also asked him if he and
McBride had any kind of problems, and Tillman said they did not. Woods also testified that Tillman
told him that he had the spent the previous night at his sister's house.

 Speer testified that while Woods was talking to Tillman, Speer ran a background
search on Tillman and discovered that he had an outstanding warrant related to an assault on a family
member. Speer arrested Tillman pursuant to the outstanding warrant and transported him to the
police station while Woods remained at the scene to continue the investigation. 

 Speer testified that, once they arrived at the station, he read Tillman his Miranda
rights (1) and proceeded to interview him on videotape. Speer testified that Tillman admitted that he
had been with McBride during the previous night, but reiterated that there had been no kind of
problem between the two of them and that Tillman had spent most of the night at his sister's house. 
Speer testified that after further questioning, Tillman eventually admitted that he and McBride had
a disagreement during the evening, and McBride "had swung at him and that he had swung back." 
Speer testified that at this point Tillman stated, "Anything else, I am going to have to speak to an
attorney." Speer did not interpret this statement as an unambiguous request for an attorney and
continued to interview Tillman. (2) Speer testified that Tillman eventually stated that McBride had
called him an "ignorant Alabama hillbilly" on the night in question and stated that, whatever had
happened to McBride, "he probably deserved it."

 On March 30, 2004, Tillman was indicted for the murder of Elroy McBride. The jury
found him guilty and assessed punishment at 25 years' confinement. This appeal followed.


DISCUSSION

Admission of suppressed statements

 In his first issue, Tillman contends that the district court erred in allowing the State 

to cross-examine him about statements that he had made to Detective Speer after he had invoked his
Sixth Amendment right to counsel. At a pretrial hearing, the district court ordered suppressed any
statements made by Tillman after he told Speer during his interview, "Anything else, I am going to
have to speak to an attorney." (3) However, during direct examination, Tillman's attorney inquired into
the same subject matter that was the focus of the suppression order:


Q: Okay. Had he [McBride] said something to you that really made you angry?


A: He told me he was going to--I was illiterate, G-D-M-F illiterate hillbilly, and
he was going to cut me up.


Q: Did that--how did that make you feel?


A: Pretty low and scared.


Q: Okay. Did it also make you angry?


A: Yes, sir.


Q: All right. Was that also a factor on what you did, your anger?


A: Yes, sir.


 Then, on cross-examination, and without objection, the State asked Tillman similar
questions:


Q: Isn't it true he called you an ignorant Alabama hillbilly?


A: Yes, sir.


. . . .


Q: Did it make you angry that he called you an ignorant Alabama hillbilly?


A: Yes, it did.


 It was only after the "hillbilly" remark had already been admitted into evidence, first
by defense and then by the State, that the State inquired into what Tillman told the police:


Q: Well, did you tell the police that he shouldn't have called you an ignorant
Alabama hillbilly?


A: Yes.


Q: Did you tell the police that when he called you an ignorant Alabama hillbilly, it
made you angry?


A: Yes, it did.


Q: It upset you?


A: Yes.



 At this point defense counsel objected, and the district court overruled the objection. 
The State then continued its questioning:


Q: You told the police that something bad happened to him--this is when you were 
denying it--that was the kind of person he was, and he probably deserved it; I
tried to help someone and all he can do is call me an ignorant Alabama hillbilly,
and there is no sense in that? 



Defense counsel restated his objection, and the district court again overruled the objection. The State
continued:



Q: Did you tell the police that?


A: Not in those exact words.


Q: But that is what you told them. You said, whatever happened to him, he
deserved it. And immediately after that, you said, all he can do is call me an
ignorant Alabama hillbilly, and there is no sense in that; isn't that correct, sir?


A: I don't recall that.


Q: And shortly after there, you said, I'm sorry, but he probably deserved it, didn't
you?


A: I don't recall that.



Again defense counsel objected, and again the district court overruled the objection. Tillman argues
on appeal that "[i]t is clear from the record that the 'hillbilly' statement had been suppressed and yet
allowed to be admitted and is thus error." (4) 

 We need not decide whether the district court erred in admitting the statements
because any such complaint was rendered harmless by Tillman's own inquiry into the same facts
during his direct examination and by his failure to object to the State's inquiry into these matters
during cross-examination. 

 It is well established that "overruling an objection to evidence will not result in
reversal when other such evidence was received without objection, either before or after the
complained-of ruling. This rule applies whether the other evidence was introduced by the defendant
or the State." Leday v. State, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); Barnes v. State, 165
S.W.3d 75, 81 (Tex. App.--Austin 2005, no pet.).

 Before the State questioned Tillman about what he told the police, the evidence that
McBride called Tillman an "ignorant Alabama hillbilly" had already been admitted without
objection. First, on direct examination, Tillman's own counsel asked him about McBride's
"hillbilly" comment. Then, on cross-examination, the State asked Tillman about the same comment. 
Thus, before the State began questioning Tillman about his statements to the police, the jury had
already heard evidence that McBride had called Tillman an "ignorant Alabama hillbilly" and that
this comment had made Tillman angry. Tillman did not object to the admission of this evidence and,
in fact, first presented it to the jury himself. "The improper admission of evidence is not reversible
error when substantially the same facts are proven by unobjected-to testimony." Hitt v. State, 53
S.W.3d 697, 708 (Tex. App.--Austin 2001, pet. ref'd). We overrule Tillman's first issue.


Self defense

 In his second issue, Tillman asserts that the evidence is legally and factually
insufficient to sustain his conviction, with particular reference to the jury's failure to find that he
acted in self-defense. 

 When there is a challenge to the legal sufficiency of the evidence to sustain a criminal
conviction, we consider whether a rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt. Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim.
App. 2005). We review all the evidence in the light most favorable to the verdict, assume that the
trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable
inferences in a manner that supports the verdict. See Griffin v. State, 614 S.W.2d 155, 159 (Tex.
Crim. App. 1981). It is not necessary that every fact point directly and independently to the
defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force
of all the incriminating circumstances. Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App.
1993). We consider even erroneously admitted evidence. Id. The jury is the exclusive judge of the
credibility of witnesses and of the weight to be given their testimony. Jones v. State, 944 S.W.2d
642, 647 (Tex. Crim. App. 1996). Reconciliation of conflicts in the evidence is within the exclusive
province of the jury. Id.

 In a factual-sufficiency review, we view all of the evidence in a neutral light, and we
set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly
unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt
could not have been met. Prible v. State, 175 S.W.3d 724, 730-31 (Tex. Crim. App. 2005); Zuniga
v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). A clearly wrong and unjust verdict occurs
where the jury's finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates
bias." Prible, 175 S.W.3d at 731 (quoting Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App.
1997)).

 When the issue of self-defense was submitted to the jury, we must also determine
whether a rational trier of fact could have found against the defendant on that issue, that is, found
beyond a reasonable doubt that the defendant's conduct was not justified. Zuliani v. State, 97
S.W.3d 589, 594 (Tex. Crim. App. 2003); Saxton v. State, 804 S.W.2d 910, 914 (Tex. Crim. App.
1991).

 As a general rule, a person is justified in using deadly force in self-defense if he
reasonably believes that deadly force is immediately necessary to protect himself against the other's
use or attempted use of unlawful deadly force, and if a reasonable person in his situation would not
have retreated. Tex. Pen. Code Ann. § 9.32 (West 2003). A person has the right to defend himself
from apparent danger to the same extent as he would if the danger were real. Hamel v. State, 916
S.W.2d 491, 493 (Tex. Crim. App. 1996).

 Whether Tillman reasonably believed that the use of deadly force was immediately
necessary under the circumstances was a fact issue for the jury. Saxton v. State, 804 S.W.2d at 913-14. The jury heard conflicting evidence regarding the circumstances preceding McBride's death.
Tillman testified that on the night of the incident, he and McBride were sitting around and drinking
beer with Jaimes and some of McBride's friends. According to Tillman, McBride "started getting
real belligerent" and told Tillman to "shut up" and "stop embarrassing him" in front of his friends. 
Tillman testified that McBride had become upset because Tillman had called him "crazy." Later that
night, after Jaimes and the others had departed, Tillman was sitting in his truck when McBride
approached him, "barked" vulgar language at him, and grabbed him by the shirt, ripping off the shirt
and Tillman's reading glasses in the process. Tillman testified that he responded by knocking down
McBride with his fist. Tillman testified that he then went from his truck to where he had been sitting
earlier to retrieve some of his belongings. Tillman testified that as he was returning to his truck,
McBride came running towards him with a butcher knife in his hand. Tillman testified that he again
punched McBride, and that this punch rendered McBride temporarily unconscious. Tillman testified
that once McBride regained consciousness, Tillman helped him up and the two of them sat down and
started talking. Tillman testified that he apologized, but told McBride that he should not have been
chasing him around. Tillman testified that this caused McBride to get upset again, and McBride
grabbed the butcher knife and "lunged at" Tillman with it. Tillman testified that at this point he
grabbed the axe and swung it at McBride. When asked by defense counsel how many times he hit
McBride with the axe, Tillman responded, "I remember twice." 

 Physical evidence was inconsistent with Tillman's testimony. Medical examiner Dr.
Vladimir Parungao performed an autopsy on McBride and testified that the victim had been struck
with an axe numerous times while he was lying on the ground. Parungao described five--not
two--"chopping" wounds to the victim's head and neck: one to the right side of the forehead; one
to the jaw; and three to the left side of the neck. In Parungao's opinion, the blows to the neck had
severed the victim's carotid artery and jugular vein and fractured his larynx, hyoid bone, and his
second, fourth, and fifth cervical vertebrae. Parungao testified that any one of the five blows would
have knocked the victim to the ground, and any one of the three blows fracturing the cervical
vertebrae would have paralyzed the victim. Parungao also testified that the three neck wounds were
"side by side," which indicated to him that the blows to the neck probably came in succession while
the victim was lying on the ground. Based on this evidence, the jury could rationally have believed
that, once the victim was lying on the ground paralyzed, it was highly unlikely that Tillman's use of
the axe was immediately necessary to protect himself. 

 In addition, the jury heard Tillman testify that McBride had called him an "ignorant
Alabama hillbilly" and that this remark had angered him. Defense counsel asked Tillman if this
anger was a factor in what he did, and Tillman testified that it was. The jury could rationally believe
that it was Tillman's anger, and not fear for his safety, that caused Tillman to repeatedly hit McBride
with the axe. 

 The State also admitted into evidence a statement given to police by Anthony Benesh,
who owned the travel trailer in front of which Tillman had parked his truck after the murder. 
Benesh's statement read, in relevant part:


Last night, on 1st of March, about 11:30 p.m. to 12 midnight, I was asleep in my
trailer. [Mark] Tillman woke me up, beating on my door. I got up and let him in. 
He had two beers and a bottle of whiskey in his hands. He was upset, and said, 'I
have done a real bad thing.' He was real upset, about to cry. He sat on a box and he
said Mack hit him four or five times and was cussing him. He said he couldn't take
any more and he had found a double bit axe, and he hit Mack with it. (5) 



The jury could rationally conclude that this statement refutes Tillman's testimony that he had struck
McBride with an axe to defend himself. 

 Viewing the evidence in the light most favorable to the verdict, we hold that a rational
trier of fact could have found the essential elements of the offense beyond a reasonable doubt.
Considering all of the evidence in a neutral light, we hold that the State's evidence of guilt was not
so weak and the evidence Tillman cites as justification for his conduct was not so strong as to
preclude a rational jury from finding beyond a reasonable doubt that Tillman's use of deadly force
was not justified. We overrule Tillman's second issue.


CONCLUSION

 Having overruled Tillman's issues on appeal, we affirm the judgment of the district 

court.



 __________________________________________

 Bob Pemberton, Justice

Before Justices B. A. Smith, Patterson and Pemberton

Affirmed

Filed: July 7, 2006

Do Not Publish
1. See Miranda v. Arizona, 384 U.S. 436 (1966).
2. When asked how he would characterize Tillman's statement, Speer testified, "It's a
statement. It's not a request." Speer did not believe the statement was "a demand for an attorney."
3. In ruling on the motion to suppress, the district court stated: 


The Court's ruling in regard to the motion to suppress regarding the statements
on the videotape, is that any conversation taking place past what the Court has
deemed to be a request for the assistance of counsel, anything after the statement,
'Anything else, I am going to have to speak to an attorney,' is ordered suppressed
at this time.
4. If the appellate record in a criminal case reveals constitutional error, we must reverse unless
we determine beyond a reasonable doubt that the error did not contribute to the conviction or
punishment. See Tex. R. App. P. 44.2(a); McCarthy v. State, 65 S.W.3d 47, 52 (Tex. Crim. App.
2001). 
5. Benesh died of natural causes prior to trial, but his written statement to the police was
admitted into evidence and read to the jury.