# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00235-CR

**Joe Rivera, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF CALDWELL COUNTY, 274TH JUDICIAL DISTRICT
### NO. 2003-021, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Joe Rivera, Jr., guilty of two counts of aggravated sexual assault and one count of indecency with a child. *See* Tex. Pen. Code Ann. §§ 21.11(a)(1), 22.021(a)(B)(iii)-(iv), .021(a)(2)(A)(ii) (West Supp. 2004-05). The jury assessed punishment, enhanced by a previous felony conviction, at life imprisonment. *See id*. § 12.42(c)(2) (West Supp. 2004-05). Rivera argues that the trial court erred by admitting (1) a statement he made while being interrogated in violation of his *Miranda* rights, and (2) DNA evidence found on the victim. Rivera also contends that the evidence was legally and factually insufficient to sustain the conviction. We will affirm the judgment of conviction.

## BACKGROUND

In June 2002, A.W., then fourteen years old, lived with her parents, Roger and Randa Wagner, and her younger brother, David, in a two-bedroom manufactured home in Caldwell

County.[1]  Roger and Randa occupied one room, and A.W. stayed in the second room.  David slept in an area of the living room that was partitioned off with bookcases for his privacy.  The house had two bathrooms.  One was located in the hallway outside the parents' room and the other was entered from A.W.'s room.  A.W.'s older sister, Christine, was engaged to Rivera and they lived in a travel trailer parked behind the Wagners' house.  Since the travel trailer had no utilities, Rivera and Christine had permission to use her parents' kitchen and bathroom.

Randa testified that on June 15, A.W. and David went to bed before midnight.  Randa explained that Roger worked late and did not arrive home until 1:30 a.m.  She prepared dinner for Roger and the two went to bed sometime around 3:00 a.m.  She stated that she did not hear anything strange during the night, but that she and Roger were "dead tired."

A.W. testified that around 4:00 a.m. Rivera came into her room and told her he needed to use the restroom, but instead sat down on her bed, put his hand over her mouth, and told her that if she screamed he would break her neck.  Rivera lay on top of her and began kissing her neck and face.  A.W. stated that Rivera began touching her "practically everywhere" and that he twice attempted to insert his penis into her vagina.  She testified further that Rivera then "went into the bathroom, got some [hair] conditioner and rubbed it on [her] butt."  A.W. attempted to lock herself in the bathroom, but the door had no lock and Rivera forced his way inside.  He then pushed A.W. against the sink and attempted to put his penis inside her vagina and her anus.[2]  A.W. testified that Rivera then told her to get back on the bed, that she was "going to be his fourteen year old

[1]  For clarity, we will refer to A.W.'s family by their first names.

[2]  A.W. testified that she was unsure whether Rivera's penis penetrated either her vagina or her anus.

2

lover," and "he was going to be [her] first and [her] last." Rivera continued kissing her neck, breast, and anus until it started to get light outside. Later A.W. told a sexual assault nurse who examined her that she did not scream "but was hoping [she] made enough noise to wake up [her] brother, David."

After Rivera left her room, A.W. went into the living room and began watching television. Soon Randa woke up and prepared to take A.W. and David to sell newspapers as planned. On the way A.W. told Randa what had happened. The three immediately returned home. After Randa explained to Roger what A.W. told her, they called the police.

Deputy James Pehl responded to the call. While he was discussing the situation with Randa, his supervisor, Sergeant Jeff Dougherty, arrived. Together, Pehl and Dougherty went around the house to the travel trailer. They found Rivera and Christine sleeping. The officers explained why they were there and began to ask a series of questions. Pehl testified that Rivera's hands were shaking and that he appeared nervous. According to Pehl, Rivera claimed that he spent the previous evening drinking with friends and returned home before it began raining.[3] After the officers finished questioning Rivera they asked him if he would like to go to the station and make a statement. Rivera declined.

Julie Veidt was the nurse on duty when A.W. was taken in for a sexual assault examination. Veidt explained that the exam is exhaustive and includes taking swabs of any place on the victim's body where the perpetrator may have deposited DNA. Veidt testified that A.W. had

---

[3] Deputy Pehl testified that after talking with other deputies he determined that it began raining at or around 4:00 a.m. Additionally, Rivera did not provide the officers with sufficient information to corroborate his whereabouts.

3

bruises on her neck and back, that her cervix was red and inflamed, that her entire anus was red, and that she had multiple superficial lacerations on her anus. Veidt further testified that the type of vaginal redness she observed on A.W. is usually caused by blunt force trauma and that A.W.'s injuries were consistent with her story of a sexual assault. Veidt acknowledged, however, that her findings could not conclusively establish that A.W. had been sexually assaulted.

On June 21, Rivera was arrested pursuant to a valid warrant and brought to the Caldwell County jail. David Brent, Captain of the Criminal Investigation Division, met Rivera at the jail and explained the charges that were being brought against him. Brent testified that he informed Rivera of his *Miranda* rights and asked him whether he understood them. Rivera told Brent that he understood his rights and that he "had three attorneys in Austin." Brent asserted that he understood Rivera's statement to mean only that he had three attorneys in Austin, not that he was invoking his right to counsel. Consequently, Brent began explaining to Rivera how the case was going to proceed. Specifically, he told Rivera that a sexual assault exam had been performed on the victim and that the results had been sent off for DNA testing. Rivera responded by stating that he felt the lab would find his DNA and that he should talk to his lawyers.

After a jury trial, Rivera was convicted of two counts of aggravated sexual assault and one count of indecency with a child. He now appeals his conviction.

**DISCUSSION**

In two issues, Rivera claims that the trial court erred by admitting his statements made in violation of his constitutional rights, and DNA evidence that was unreliable and irrelevant.

4

Additionally, Rivera avers that the evidence was legally and factually insufficient to support his conviction. We will address each issue in turn.

**Admission of DNA Evidence**

In his third issue, Rivera contends that the trial court erroneously admitted evidence indicating that his DNA was found in saliva located over a bruise on A.W.'s neck. Rivera claims that the DNA evidence is unreliable because there is no test that can determine precisely when the DNA was deposited. In order for Rivera to properly challenge the reliability of the DNA evidence, he must attack either (1) the validity of the underlying scientific theory, (2) the validity of the technique applying the theory, or (3) whether the technique was properly applied in this case. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). He does not do this. Nor does he question the accuracy of the test that identified his DNA. He simply points out that it is possible that the DNA could have been innocently deposited prior to the attack. While that is possible, it is a fact question for the jury that has no bearing on the reliability of the DNA evidence in question.

Rivera similarly claimed that the fact that his DNA was found on A.W. is not relevant to a determination of whether he sexually assaulted her because it could have been transferred innocently onto A.W. and because the prosecution could not establish when it was transferred. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Tex. R. Evid. 401. A.W. testified that Rivera repeatedly kissed her neck throughout the attack. Rivera's DNA was discovered in a sample of saliva that was located on a fresh bruise on A.W.'s neck. Thus, the location of Rivera's DNA is consistent with A.W.'s account of the attack.

5

Accordingly, the DNA evidence is clearly relevant when determining the credibility of A.W.'s accusation. We hold that the evidence was both reliable and relevant.

Finally, Rivera claims that even if the DNA evidence is relevant it should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. When an objection on Rule 403 grounds is raised at trial, we review the judge's ruling for an abuse of discretion and will reverse only if the ruling is outside the zone of reasonable disagreement. *See State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005); *see also Salazar v. State*, 38 S.W.3d 141, 150-53 (Tex. Crim. App. 2001). A proper Rule 403 analysis includes, but is not limited to, four factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Mechler*, 153 S.W.3d at 440.

The first factor in a Rule 403 analysis looks to the evidence's probativeness or how compellingly the evidence serves to make a fact of consequence more or less probable. *Id*. Here, the probative value of the DNA evidence is that it corroborates A.W.'s account of the attack. Additionally, the fact that the DNA was found on top of a fresh bruise is some evidence supporting the conclusion that it was deposited at approximately the same time the bruise appeared.

The second factor asks whether the evidence has the potential to impress the jury in some irrational but indelible way. *Id*. Rule 403 is designed to exclude evidence that is unfairly prejudicial. Tex. R. Evid. 403. "Unfair prejudice" refers only to relevant evidence's tendency to tempt the jury into finding guilt on grounds apart from the proof of the offense charged. *Mechler*, 153 S.W.3d at 440. While the DNA evidence in this case is certainly prejudicial, it is not unfairly

6

prejudicial because it provides circumstantial proof of the offense charged. Under these circumstances, the DNA evidence presented was not such that it would tempt the jury to come to irrational conclusions.

The third factor looks to the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense. *Id*. at 441. The trial transcripts demonstrate that the prosecution did not spend an undue amount of time developing the scientific backdrop for the contested DNA evidence. Furthermore, because the DNA test results directly link Rivera to A.W. in a manner consistent with her testimony, the jury would not have been distracted from the indicted offense.

The final factor focuses on the proponent's need for the evidence. *Id*. This factor encompasses the issues of whether the proponent has other evidence establishing this fact and whether the fact is related to a disputed issue. *Id*. In *Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003), the court of criminal appeals held that a proponent's need for evidence is great when there is a disputed issue and the proponent has no other evidence to prove the fact at issue. That is exactly the situation in this case. There are no witnesses that can disprove Rivera's contention that his DNA was innocently transferred onto A.W., but the discovery of his DNA on top of a fresh bruise serves to dispute his theory. Thus, the State's need for the evidence is great.

We find that all four factors discussed by the court of criminal appeals favor admission of the DNA evidence. Because the probative value of the DNA evidence was not substantially outweighed by the danger of unfair prejudice, we hold that the trial court did not abuse its discretion by admitting the DNA evidence. We overrule Rivera's third issue.

**Admission of Statement**

In his first issue, Rivera claims that the trial court erroneously admitted his statement that his DNA would be found by the lab testing the swabs taken during A.W.'s sexual assault exam. The statement came in response to Captain Brent's explanation of the procedural steps that had occurred during the course of the investigation. Rivera contends that prior to making this statement he invoked his right to counsel, but Brent remained in the room and continued the interrogation. Consequently, Rivera argues that his statement was the byproduct of illegal interrogation tactics and that it was improperly admitted by the trial court. We disagree.

When an accused has expressed his desire to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 481-85 (1981). "The right to counsel is considered invoked where a person indicates he or she desires to speak to an attorney or have an attorney present during questioning." *Lucas v. State*, 791 S.W.2d 35, 45 (Tex. Crim. App. 1989). An invocation must be clear and unambiguous; the mere mention of the words "attorney" or "lawyer" without more, does not automatically invoke the right to counsel. *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995). The court of criminal appeals has held that a suspect must express a definite desire to speak to an attorney in order to invoke his right to counsel. *Dinkins*, 894 S.W.2d at 352.

When reviewing alleged invocations of the right to counsel, we look at the totality of the circumstances surrounding the interrogation, as well as the alleged invocation, to determine

8

whether a suspect's statement can be construed as an actual invocation of his right to counsel. *Id.* at 351. If the appellate record in a criminal case reveals constitutional error, we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a); *McCarthy v. State*, 65 S.W.3d 47, 52 (Tex. Crim. App. 2001).

The Supreme Court addressed the issue of ambiguous invocations of the right to counsel in *Davis v. United States*, 512 U.S. 452 (1994). The court explained that unlike the right to counsel under the Sixth Amendment which attaches automatically, the right to counsel under *Miranda* is a prophylactic measure and is not inherent in the Fifth Amendment. *Davis*, 512 U.S. at 457-59; *Dinkins*, 894 S.W.2d at 351-52. Thus, a court's focus is on whether a suspect actually invokes his right. *Davis*, 512 U.S. at 457-59; *Dinkins*, 894 S.W.2d at 351. In *Davis*, the Supreme Court asserted that this inquiry is purely objective: the invocation must be articulated in such a manner that a reasonable police officer in the situation would understand the statement to be a request for an attorney. *Davis*, 512 U.S. at 459. If the alleged invocation is not sufficiently clear, *Edwards* does not require that interrogation of a suspect be terminated. *Id*.

Here, Rivera's *Miranda* rights were explained to him and he stated that he understood his rights. He then asserted that he had three attorneys in Austin. Brent claimed that he considered Rivera's statement to mean only that—he had three attorneys in Austin. This statement alone did not sufficiently articulate a desire to speak to an attorney. *See Dinkins*, 894 S.W.2d at 351 (mere mention of the words "attorney" or "lawyer" without more, does not automatically invoke right to

9

counsel).[4] It was exactly what Brent considered it to be, a blanket statement that Rivera had attorneys, and nothing more. It was completely ambiguous as to whether Rivera actually desired to speak to his attorneys right then. Thus, Brent was not required to terminate Rivera's interrogation at that time. *Davis*, 512 U.S. at 459.

Brent explained to Rivera the charges that were being brought against him and the investigative process. Rivera responded to Brent's explanation of the DNA testing that would be conducted on evidence gathered from the victim by stating that he felt the lab would find his DNA and that he should talk to his lawyers. Rivera did not unambiguously invoke his right to counsel until *after* he made the statement regarding his concern that his DNA would be found on the victim. Therefore, the statement was not made in violation of *Edwards* and the trial court did not err in admitting the statement.

Even if Rivera had sufficiently invoked his right to counsel prior to making the statement, the trial court's admission of the statement was harmless. When the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, as would be the case here, an appellate court must reverse a judgment of conviction unless it determines beyond a reasonable doubt that the error did not contribute to the conviction. *See* Tex. R. App. P. 44.2(a); *Jones v. State*, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003). If there is a reasonable likelihood that an error materially affected the jury's deliberations, then the error was not harmless. *Jones*, 119 S.W.3d at 777. We must calculate, as nearly as possible, the probable impact of the error on the jury

---

[4] Additionally, Captain Brent's subjective belief that he should stop the interrogation is not determinative of our objective inquiry into whether Rivera unambiguously invoked his right to counsel.

in light of the other evidence. *McCarthy*, 65 S.W.3d at 55. Thus, we examine the source of the error, the nature of the error, and the extent to which it was emphasized by the State. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).

The impact of Rivera's statement appears slight when viewed in the context of the trial as a whole. Rivera voluntarily consented to a DNA test. His DNA matched DNA that was found on the complainant. Therefore, even without his statement, the jury would have been informed of the presence of his DNA on A.W. Rivera's counsel argued that Rivera's DNA could have been innocently transferred to A.W. because they had a close relationship that involved wrestling and other socially acceptable physical contact. Furthermore, because Rivera's statement does not specifically implicate him in any wrongdoing, it is consistent with his trial theory that his DNA could have been innocently transferred onto A.W. Additionally, the record indicates that the prosecution did not unduly emphasize Rivera's statement. Therefore, we conclude that even if the admission of the statement was error, it was harmless. *See* Tex. R. App. P. 44.2(a). We overrule Rivera's first issue.

**Legal and Factual Sufficiency**

In his second issue, Rivera contends that the evidence presented at trial was both legally and factually insufficient to support his conviction. Thus, we must determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (legal sufficiency); *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004) (factual sufficiency); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981) (legal sufficiency). In a legal sufficiency review, all the evidence

11

is reviewed in the light most favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Griffin*, 614 S.W.2d at 159 (citing *Jackson*, 443 U.S. at 318-19). In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). The evidence will be deemed factually insufficient to sustain the conviction if the proof of guilt is too weak or the contrary evidence is too strong to support a finding of guilt beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484-85; *see Johnson*, 23 S.W.3d at 11. Under either review, the jury is the exclusive judge of the witnesses' credibility and the weight to be given to their testimony. *See Jones v. State*, 944 S.W.2d 642, 647-48 (Tex. Crim. App. 1996).

Rivera was convicted of two counts of aggravated sexual assault and one count of indecency with a child. *See* Tex. Pen. Code Ann. §§ 21.11(a)(1), 22.021(a)(B)(iii)-(iv), .021(a)(2)(A)(ii). Although Rivera purports to challenge both the legal and factual sufficiency of the evidence, his analysis focuses solely on the factual sufficiency. Rivera attacks the credibility of the State's witnesses in his attempt to show that the evidence presented was too weak to support his conviction. Specifically, Rivera claims that A.W.'s testimony is unbelievable because (1) she stated that Rivera went into the bathroom for approximately twenty minutes during the attack, but she did

12

not attempt to escape or cry out for help; (2) she did not know if she was penetrated; and (3) she testified that Rivera used a lubricant, but failed to inform the police of this fact on the morning of the assault. He also questions Randa's testimony that she went to bed between 3:00 and 4:00 a.m. and yet did not hear an assault that began around 4:00 a.m. He reiterates his contention that the prosecution's DNA expert's testimony was unreliable because he could not state when Rivera's saliva was deposited on A.W.'s neck. Finally, he claims that Christine's testimony that he was with her the entire night further undermines the prosecution's witnesses' credibility.[5] The evidence that he cites, however, would serve to defeat a legal sufficiency challenge because we assume that the jury resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Griffin*, 614 S.W.2d at 159; *see also Jones*, 944 S.W.2d at 647-48.

Despite hearing Rivera's arguments regarding the credibility of the prosecution's witnesses, the jury determined that the prosecution proved its case beyond a reasonable doubt. In light of the evidence presented at trial, we cannot conclude that a manifest injustice has occurred such that we should not defer to the jury's findings. *See Johnson*, 23 S.W.3d at 9. Furthermore, the jury is the exclusive judge of the witnesses' credibility and the weight to be given to their testimony. *See Jones*, 944 S.W.2d at 647-48. We do not find that the evidence, when viewed in a neutral light,

---

[5] Rivera's description of Christine's testimony is inaccurate. Christine testified that on the night of the assault she went to bed at 10:00 p.m. and that Rivera was not home at the time. She stated that as far she knew Rivera was in bed with her the whole evening. However, she was unsure what time he came home except that it was raining. She was also uncertain about whether Rivera left the trailer at any point after he came home. She stated further that she heard the trailer door open periodically throughout the night, but explained that both a strong wind and their dog could open the door.

13

is too weak to support Rivera's convictions. *Zuniga*, 144 S.W.3d at 484-85; *see Johnson*, 23 S.W.3d at 11. Therefore, we hold that the evidence presented at trial was factually sufficient. We overrule Rivera's second issue.

## CONCLUSION

We affirm the judgment of conviction.


_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: May 26, 2005

Do Not Publish