# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00038-CR

**Mark Tillman, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT NO. 5040095, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Mark Tillman was convicted of murder. *See* Tex. Pen. Code Ann. § 19.02 (West 2003). In two issues on appeal, Tillman asserts that the district court erred in admitting evidence that it had previously ordered suppressed, and that the evidence is legally and factually insufficient to sustain his conviction. We will affirm the judgment of the district court.

## BACKGROUND

The jury heard evidence that, on the morning of March 2, 2004, Porfirio Jaimes discovered the body of Elroy McBride on his property, where McBride had been living in a mobile home. Jaimes recounted that blood was pooled around McBride's head. Jaimes notified the authorities, and Deputy Keith Mutscher and Detectives Robert Speer and Rudy Woods of the Travis County Sheriff's Office went to the property to investigate. Deputy Mutscher testified that

McBride's body was located in a "tent-like" structure and covered under an "Indian or Mexican style blanket." Blood was splattered on the structure. A two-bladed axe, coated with blood and hair, was discovered near the body.

Detective Speer testified that Jaimes told him that he had seen a truck on the property the previous night, and that this truck was now parked "up the street on the corner." The officers and Jaimes went to the location where the truck was parked, which was in the street in front of a travel trailer. Speer testified that "within a matter of minutes" they were approached by Mark Tillman, who identified himself and verified that the truck belonged to him. Detective Woods testified that he did not see any evidence of bruises or injuries on Tillman. Woods testified that he asked Tillman if he knew Elroy McBride, and Tillman responded that he did. Woods also asked him if he and McBride had any kind of problems, and Tillman said they did not. Woods also testified that Tillman told him that he had the spent the previous night at his sister's house.

Speer testified that while Woods was talking to Tillman, Speer ran a background search on Tillman and discovered that he had an outstanding warrant related to an assault on a family member. Speer arrested Tillman pursuant to the outstanding warrant and transported him to the police station while Woods remained at the scene to continue the investigation.

Speer testified that, once they arrived at the station, he read Tillman his *Miranda* rights[1] and proceeded to interview him on videotape. Speer testified that Tillman admitted that he had been with McBride during the previous night, but reiterated that there had been no kind of

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

problem between the two of them and that Tillman had spent most of the night at his sister's house. Speer testified that after further questioning, Tillman eventually admitted that he and McBride had a disagreement during the evening, and McBride "had swung at him and that he had swung back." Speer testified that at this point Tillman stated, "Anything else, I am going to have to speak to an attorney." Speer did not interpret this statement as an unambiguous request for an attorney and continued to interview Tillman.[2] Speer testified that Tillman eventually stated that McBride had called him an "ignorant Alabama hillbilly" on the night in question and stated that, whatever had happened to McBride, "he probably deserved it."

On March 30, 2004, Tillman was indicted for the murder of Elroy McBride. The jury found him guilty and assessed punishment at 25 years' confinement. This appeal followed.

## DISCUSSION

**Admission of suppressed statements**

In his first issue, Tillman contends that the district court erred in allowing the State to cross-examine him about statements that he had made to Detective Speer after he had invoked his Sixth Amendment right to counsel. At a pretrial hearing, the district court ordered suppressed any statements made by Tillman after he told Speer during his interview, "Anything else, I am going to

---

[2] When asked how he would characterize Tillman's statement, Speer testified, "It's a statement. It's not a request." Speer did not believe the statement was "a demand for an attorney."

3

have to speak to an attorney."[3] However, during direct examination, Tillman's attorney inquired into the same subject matter that was the focus of the suppression order:

Q: Okay. Had he [McBride] said something to you that really made you angry?

A: He told me he was going to—I was illiterate, G-D-M-F illiterate hillbilly, and he was going to cut me up.

Q: Did that—how did that make you feel?

A: Pretty low and scared.

Q: Okay. Did it also make you angry?

A: Yes, sir.

Q: All right. Was that also a factor on what you did, your anger?

A: Yes, sir.

Then, on cross-examination, and without objection, the State asked Tillman similar questions:

Q: Isn't it true he called you an ignorant Alabama hillbilly?

A: Yes, sir.

. . . .

---

[3] In ruling on the motion to suppress, the district court stated:

The Court's ruling in regard to the motion to suppress regarding the statements on the videotape, is that any conversation taking place past what the Court has deemed to be a request for the assistance of counsel, anything after the statement, 'Anything else, I am going to have to speak to an attorney,' is ordered suppressed at this time.

4

Q: Did it make you angry that he called you an ignorant Alabama hillbilly?

A: Yes, it did.

It was only after the "hillbilly" remark had already been admitted into evidence, first by defense and then by the State, that the State inquired into what Tillman told the police:

Q: Well, did you tell the police that he shouldn't have called you an ignorant Alabama hillbilly?

A: Yes.

Q: Did you tell the police that when he called you an ignorant Alabama hillbilly, it made you angry?

A: Yes, it did.

Q: It upset you?

A: Yes.

At this point defense counsel objected, and the district court overruled the objection. The State then continued its questioning:

Q: You told the police that something bad happened to him—this is when you were denying it—that was the kind of person he was, and he probably deserved it; I tried to help someone and all he can do is call me an ignorant Alabama hillbilly, and there is no sense in that?

Defense counsel restated his objection, and the district court again overruled the objection. The State continued:

5

Q: Did you tell the police that?

A: Not in those exact words.

Q: But that is what you told them. You said, whatever happened to him, he deserved it. And immediately after that, you said, all he can do is call me an ignorant Alabama hillbilly, and there is no sense in that; isn't that correct, sir?

A: I don't recall that.

Q: And shortly after there, you said, I'm sorry, but he probably deserved it, didn't you?

A: I don't recall that.

Again defense counsel objected, and again the district court overruled the objection. Tillman argues on appeal that "[i]t is clear from the record that the 'hillbilly' statement had been suppressed and yet allowed to be admitted and is thus error."[4]

We need not decide whether the district court erred in admitting the statements because any such complaint was rendered harmless by Tillman's own inquiry into the same facts during his direct examination and by his failure to object to the State's inquiry into these matters during cross-examination.

It is well established that "overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling. This rule applies whether the other evidence was introduced by the defendant

---

[4] If the appellate record in a criminal case reveals constitutional error, we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a); *McCarthy v. State*, 65 S.W.3d 47, 52 (Tex. Crim. App. 2001).

or the State." *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *Barnes v. State*, 165 S.W.3d 75, 81 (Tex. App.—Austin 2005, no pet.).

Before the State questioned Tillman about what he told the police, the evidence that McBride called Tillman an "ignorant Alabama hillbilly" had already been admitted without objection. First, on direct examination, Tillman's own counsel asked him about McBride's "hillbilly" comment. Then, on cross-examination, the State asked Tillman about the same comment. Thus, before the State began questioning Tillman about his statements to the police, the jury had already heard evidence that McBride had called Tillman an "ignorant Alabama hillbilly" and that this comment had made Tillman angry. Tillman did not object to the admission of this evidence and, in fact, first presented it to the jury himself. "The improper admission of evidence is not reversible error when substantially the same facts are proven by unobjected-to testimony." *Hitt v. State*, 53 S.W.3d 697, 708 (Tex. App.—Austin 2001, pet. ref'd). We overrule Tillman's first issue.

**Self defense**

In his second issue, Tillman asserts that the evidence is legally and factually insufficient to sustain his conviction, with particular reference to the jury's failure to find that he acted in self-defense.

When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict, assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable

inferences in a manner that supports the verdict. *See Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981). It is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). We consider even erroneously admitted evidence. *Id*. The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Id*.

In a factual-sufficiency review, we view all of the evidence in a neutral light, and we set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *Prible v. State*, 175 S.W.3d 724, 730-31 (Tex. Crim. App. 2005); *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). A clearly wrong and unjust verdict occurs where the jury's finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Prible*, 175 S.W.3d at 731 (quoting *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997)).

When the issue of self-defense was submitted to the jury, we must also determine whether a rational trier of fact could have found against the defendant on that issue, that is, found beyond a reasonable doubt that the defendant's conduct was not justified. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

8

As a general rule, a person is justified in using deadly force in self-defense if he reasonably believes that deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force, and if a reasonable person in his situation would not have retreated. Tex. Pen. Code Ann. § 9.32 (West 2003). A person has the right to defend himself from apparent danger to the same extent as he would if the danger were real. *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996).

Whether Tillman reasonably believed that the use of deadly force was immediately necessary under the circumstances was a fact issue for the jury. *Saxton v. State*, 804 S.W.2d at 913-14. The jury heard conflicting evidence regarding the circumstances preceding McBride's death. Tillman testified that on the night of the incident, he and McBride were sitting around and drinking beer with Jaimes and some of McBride's friends. According to Tillman, McBride "started getting real belligerent" and told Tillman to "shut up" and "stop embarrassing him" in front of his friends. Tillman testified that McBride had become upset because Tillman had called him "crazy." Later that night, after Jaimes and the others had departed, Tillman was sitting in his truck when McBride approached him, "barked" vulgar language at him, and grabbed him by the shirt, ripping off the shirt and Tillman's reading glasses in the process. Tillman testified that he responded by knocking down McBride with his fist. Tillman testified that he then went from his truck to where he had been sitting earlier to retrieve some of his belongings. Tillman testified that as he was returning to his truck, McBride came running towards him with a butcher knife in his hand. Tillman testified that he again punched McBride, and that this punch rendered McBride temporarily unconscious. Tillman testified that once McBride regained consciousness, Tillman helped him up and the two of them sat down and

9

started talking. Tillman testified that he apologized, but told McBride that he should not have been chasing him around. Tillman testified that this caused McBride to get upset again, and McBride grabbed the butcher knife and "lunged at" Tillman with it. Tillman testified that at this point he grabbed the axe and swung it at McBride. When asked by defense counsel how many times he hit McBride with the axe, Tillman responded, "I remember twice."

Physical evidence was inconsistent with Tillman's testimony. Medical examiner Dr. Vladimir Parungao performed an autopsy on McBride and testified that the victim had been struck with an axe numerous times while he was lying on the ground. Parungao described five—not two—"chopping" wounds to the victim's head and neck: one to the right side of the forehead; one to the jaw; and three to the left side of the neck. In Parungao's opinion, the blows to the neck had severed the victim's carotid artery and jugular vein and fractured his larynx, hyoid bone, and his second, fourth, and fifth cervical vertebrae. Parungao testified that any one of the five blows would have knocked the victim to the ground, and any one of the three blows fracturing the cervical vertebrae would have paralyzed the victim. Parungao also testified that the three neck wounds were "side by side," which indicated to him that the blows to the neck probably came in succession while the victim was lying on the ground. Based on this evidence, the jury could rationally have believed that, once the victim was lying on the ground paralyzed, it was highly unlikely that Tillman's use of the axe was immediately necessary to protect himself.

In addition, the jury heard Tillman testify that McBride had called him an "ignorant Alabama hillbilly" and that this remark had angered him. Defense counsel asked Tillman if this anger was a factor in what he did, and Tillman testified that it was. The jury could rationally believe

10

that it was Tillman's anger, and not fear for his safety, that caused Tillman to repeatedly hit McBride with the axe.

The State also admitted into evidence a statement given to police by Anthony Benesh, who owned the travel trailer in front of which Tillman had parked his truck after the murder. Benesh's statement read, in relevant part:

> Last night, on 1st of March, about 11:30 p.m. to 12 midnight, I was asleep in my trailer. [Mark] Tillman woke me up, beating on my door. I got up and let him in. He had two beers and a bottle of whiskey in his hands. He was upset, and said, 'I have done a real bad thing.' He was real upset, about to cry. He sat on a box and he said Mack hit him four or five times and was cussing him. He said he couldn't take any more and he had found a double bit axe, and he hit Mack with it.[5]

The jury could rationally conclude that this statement refutes Tillman's testimony that he had struck McBride with an axe to defend himself.

Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Considering all of the evidence in a neutral light, we hold that the State's evidence of guilt was not so weak and the evidence Tillman cites as justification for his conduct was not so strong as to preclude a rational jury from finding beyond a reasonable doubt that Tillman's use of deadly force was not justified. We overrule Tillman's second issue.

---

[5] Benesh died of natural causes prior to trial, but his written statement to the police was admitted into evidence and read to the jury.

11

**CONCLUSION**

Having overruled Tillman's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices B. A. Smith, Patterson and Pemberton

Affirmed

Filed:   July 7, 2006

Do Not Publish