**Affirmed and Opinion Filed April 12, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00545-CR

**PROMISE LASHAWN KELLEY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F12-56130-I**

## MEMORANDUM OPINION
Before Justices Francis, Lang-Miers, and Myers
Opinion by Justice Francis

Promise Lashawn Kelley was charged with capital murder by committing murder in the course of committing or attempting to commit a robbery. A jury convicted him of the lesser-included offense of murder and assessed punishment at sixty years in prison. In seven issues, appellant raises complaints about the sufficiency of the evidence to support his conviction, improper impeachment of a witness, admission of extraneous offense evidence, and charge error. For reasons set out below, we conclude appellant's issues are without merit. We affirm the trial court's judgment.

On May 20, 2012, the body of Fredy Villalta was found in the middle of the service road of LBJ Freeway in Dallas. Villalta had been shot once in the head. A closed knife was found in his pocket. Two fired cartridge casings were found on the curb of the road.

Police identified appellant as a suspect and, through investigation, learned that Villalta had been a customer of one of appellant's prostitutes. When the sexual encounter did not go as planned, Villalta took back his money. Appellant confronted Villalta, and the two fought. Appellant admitted that he shot Villalta as Villalta ran away but claimed he was acting in self-defense because he believed Villalta was going for a gun.

Fatima Scott and Alexis Talton, both prostitutes who worked for appellant, were eyewitnesses to the shooting and testified at trial. Both also had been charged with capital murder. They came to Dallas from Oklahoma with appellant and another prostitute, Shelby "Summer" Brown, in May 2012 to make money. According to both, appellant required they earn a daily "quota" of $500. They rented a room at a hotel on LBJ Freeway near Coit Road in North Dallas, and the women tried to generate business through the internet and by walking the "strip."

On their second night, Alexis met Villalta while working the street with Fatima and Summer. Alexis told Villalta she charged $100 for thirty minutes, got in his car, and directed him to the hotel. Fatima and Summer went with appellant, who followed Villalta back to the hotel. Alexis and Villalta went to the room while Fatima, Summer, and appellant waited in the car on the parking lot. When the "date" appeared to be taking too long, appellant told Fatima and Summer to go upstairs and check on Alexis. When they reached the room, Fatima listened at the door and heard Alexis telling Villalta to "stop" and also heard a slapping sound.

Fatima and Summer told appellant, who went upstairs to the hotel room. Before he could open the door, Villalta walked out with Alexis behind him. Appellant went into the room, then came back out and followed Alexis and Villalta downstairs. Fatima and Summer waited before they followed. When Fatima got to the bottom of the staircase, she saw appellant and Villalta fighting; Alexis was "just standing there." According to Fatima, Villalta was able to get away and ran out the door. Appellant ran after him, and the fight continued on the parking lot. As the

two reached the grassy area next to the service road, Fatima said Villalta "started running" and appellant shot him twice.

Alexis testified Villalta never hit or slapped her, but "in the middle of the date," he wanted to engage in anal sex. Alexis refused and asked him to leave. Villalta picked up the $100 bill he had given her before they had sex and left the room. Alexis said she knew appellant would beat her badly if she did not give him money after her "date" with Villalta, so she followed Villalta and demanded he return her money. Villalta refused.

Once in the stairwell, appellant was beside her and told Villalta, "You're not going to pay my bitch?" The two began fighting. While appellant and Villalta struggled with each other, Alexis tried to reach in Villalta's pocket to get the money. She also noticed that Villalta was reaching for appellant's front pocket, where he kept a gun. Alexis said the imprint of the gun was visible in appellant's pocket. Appellant pushed Villalta toward the door, and Villalta turned and ran out with appellant chasing him. As the two neared the service road, Alexis said appellant shot Villalta. She said she heard two shots and saw Villalta fall to the ground. Alexis said appellant knew Villalta had not paid her because she was chasing Villalta and did not give appellant money at the hotel door as soon as she saw him.

After the shooting, the women got in the car with appellant and fled the scene. Summer was driving and dropped appellant and Alexis on a nearby street while Fatima and Summer went back to the hotel to get their belongings. Afterwards, they picked up appellant and Alexis and the four returned to Oklahoma that night. A day later, Alexis left appellant. Appellant, Fatima, and Summer went to Houston, where they were arrested two days later. Houston police found a Ruger 9mm pistol wrapped in a towel and hidden under the mattress in a hotel room where appellant was found; the loaded magazine of the pistol was on the bed. A firearms expert determined the two cartridges recovered from the shooting scene were fired from the Ruger

pistol. Dallas Detective Scott Sayers went to Houston, where he interviewed appellant. A recording of the interview was admitted into evidence.

Police learned the hotel where the shooting occurred had thirty-two surveillance cameras, sixteen inside and sixteen outside, that captured the shooting as well as some of the events leading up to the shooting. The recordings were admitted at trial. They showed (1) Alexis and Villalta walking down the hallway before appellant came into the frame; (2) appellant and Villalta fighting in the stairwell; (3) Alexis trying to take something from Villalta during the fight; (4) Villalta fleeing the building; (5) appellant chasing Villalta across the parking lot (6) a brief struggle before Villalta ran to the street; (7) muzzle fire from appellant's gun, and (8) the women and appellant immediately running to the car and driving away.

The medical examiner testified Villalta died of a single gunshot wound to the head. The bullet entered behind his left ear and exited his right eye. Because no soot or stripling was detected, the medical examiner believed the shooter was at least three to four feet from Villalta at the time he shot him. In addition to the gunshot wound, Villalta had multiple fresh contusions and abrasions to his head, neck, trunk, and extremities, which the medical examiner agreed could have been sustained in a fight.

Appellant's version of what happened differed from that of Fatima and Alexis. He testified that when he first saw Villalta that night, he looked like he might "be trouble." Appellant said he called both Fatima and Summer to warn them not to get in his car, but he could not reach Alexis. When Alexis got in Villalta's car, he followed them. Appellant said when they arrived at the hotel parking lot, Alexis walked to his car to get the hotel key. Appellant said he told her he did not want her to go with Villalta because he had a "weird feeling," but Alexis ignored him and got the room key from Summer.

–4–

After a while, Fatima and Summer went to the room to check on Alexis while appellant stayed in the car. When they returned, appellant went to the room. Outside the door he could hear Alexis telling Villalta, "No. Stop" and said she sounded in "distress." Appellant said Summer used her key to open the door, and he saw Alexis up against the wall with Villalta's arm against her neck. Appellant said he believed Alexis had been raped. He walked into the room and asked Alexis what happened "to get her side of the story." Villalta "just sat there looking" and then walked out of the room and headed down the hall. Appellant followed but denied knowing anything about a "pay agreement."

When they reached the stairwell, appellant said he confronted Villalta and asked, "You like to rape girls?" Appellant then asked Alexis if she was going to report the rape or "do something." At that point, appellant said Villalta took a "swing" at him and the fight began. During the struggle, appellant said he felt "some steel" in Villalta's pocket, believed it was a gun, and tried to keep Villalta from reaching for it.

According to appellant, Villalta ran out the door and then "taunted" him by throwing down his shirt and telling him to "come on." Appellant did not see any weapon on Villalta. Appellant chased after Villalta and "tangled" with him again when they reached the edge of the parking lot. Appellant said Villalta took off running and then put his hand in his pocket and turned. Appellant said he believed Villalta was going for a gun, acted "off reflex," and shot Villalta because he thought Villalta was going to try to kill him.

On cross-examination, appellant admitted Villalta was running away from him and toward the highway when appellant fired. He acknowledged he did not see Villalta reach for anything until he was in the service road. When asked why he could not have stayed "safe inside" the hotel when Villalta ran out, appellant responded that he was not in his "right mind" at the time. Appellant also acknowledged that as he chased Villalta, he ran past the safety of his

–5–

own car just two parking spaces over. He denied that he was trying to get money and said he did not know Villalta "was supposed to give us some money or that she had got some money."

In his first issue, appellant claims the evidence is insufficient to support his conviction for murder because a rational jury could not have found against him on the issue of self-defense.

When an appellant urges a sufficiency challenge on the basis of his claim of self-defense, we do not look to whether the State presented evidence that refuted self-defense. Instead, after reviewing all the evidence in the light most favorable to the verdict, we determine whether any rational trier of fact (1) would have found the essential elements of the offense beyond a reasonable doubt and (2) would have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). The jury resolves any conflicts in the testimony and determines the credibility of the witnesses and the weight to be given their testimony. *See Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Our duty is to ensure the evidence presented supports the jury's verdict and the State has presented a legally sufficient case of the offense charged. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

A person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id*. § 9.31(a) (West 2011). A person is justified in using deadly force against another if (1) he would be justified in using force against another under section 9.31 and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect him against the other's use or attempted use of unlawful deadly force or to prevent the other's

–6–

imminent commission of aggravated kidnapping, murder, sexual assault, robbery, or aggravated robbery. *Id*. § 9.32(a) (West 2011).

The defendant has the initial burden of producing evidence to raise self-defense, and the State then has the final burden of persuasion to disprove it. *Saxton*, 804 S.W.2d at 914. The State is not obligated to offer evidence refuting a claim of self-defense; rather, the State is required to prove its case beyond a reasonable doubt. *Id*. When a fact finder determines the defendant is guilty, there is an implicit finding against the defensive theory. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).

In challenging the jury's rejection of his self-defense claim, appellant does not argue any particular facts; rather, he generally asserts the evidence established that he "feared for his life" and was "acting in self defense when the shots were fired."

But the jury heard all the evidence and, most significantly, viewed video that captured the shooting. The evidence showed appellant went after Villalta because he did not pay Alexis for their sexual encounter. Both Fatima and Alexis testified appellant chased Villalta across the parking lot and out into the street before shooting him. Neither saw Villalta with a weapon. Video corroborated their testimony and captured Villalta bolting across the parking lot trying to get away from appellant. As they reached the grassy area before the service road, the video showed appellant punching Villalta before Villalta broke away and ran into the road. Appellant stood in the grassy area, raised his arm, and shot Villalta. The video showed the muzzle flash from the gun. Two cartridges from appellant's gun were found near the curb. Although appellant testified he believed Villalta was going for a gun because he felt "steel" in his pocket, the jury could have disbelieved his testimony. The only weapon found on Villalta was a closed knife. Finally, the medical examiner testified the bullet entered Villalta's scalp behind his left ear, went through his brain and skull, and exited out of the right eye, which undermined

–7–

appellant's account that Villalta had turned to shoot him. After reviewing all the evidence in the light most favorable to the prosecution, we conclude any rational trier of fact would have found the essential elements of murder and the same rational trier of fact would have found against appellant on the issue of self-defense. *See Saxton*, 804 S.W.2d at 914. We overrule the first issue.

In his second issue, appellant contends the evidence is insufficient to corroborate the accomplice-witness testimony. Within this issue, appellant does nothing more than generally recite the law regarding the accomplice-witness rule and conclude there was a lack of corroborating evidence. He provides no analysis of the law to the facts of his case.

An appellant's brief must contain a clear and concise argument for the contentions made with appropriate citations to authorities and the record. *See* TEX. R. APP. P. 38.1(i). Because appellant's issue fails to provide any substantive analysis, we conclude his issue is inadequately briefed. *See id.; see also McCarthy v. State*, 65 S.W.3d 47, 49 n.2 (Tex. Crim. App. 2001) (stating inadequately briefed issue may be waived on appeal). Even if the issue was adequately briefed, however, other evidence corroborated the testimony of Fatima and Alexis, who were both identified in the charge as accomplices.

The accomplice-witness rule provides that a conviction cannot stand on accomplice testimony unless it is corroborated by other evidence tending to connect the defendant to the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). In making our review, we eliminate all of the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The corroborating evidence need not be sufficient by itself to establish guilt; there simply needs to be "other" evidence "tending to connect" the defendant to the offense. *Id*. It may confirm a "mere

detail" rather than the elements of the offense. *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

Here, appellant testified he shot Villalta, albeit in self-defense. Moreover, the hotel surveillance video alone corroborated Fatima and Alexis's testimony that Villalta was running from appellant when appellant shot him in the street. The video evidence not only "tended to connect" appellant to Villalta's murder, it showed appellant committing the offense. Because there was sufficient corroborating evidence, we overrule the second issue.

In his third issue, appellant argues the trial court erred by overruling his objection to the State impeaching its own witness, Fatima, with a prior inconsistent statement. In particular, Fatima testified she did not recall appellant ever telling her to steal from customers. But she also said that after watching a video (presumably of her interview with the police), she did remember telling the detective that fact. She further recalled telling the detective that "the plan was to get the money anyway, anyhow, that [appellant] was going to get his money."

Referencing *Hughes v. State*, 4 S.W.3d 1, 3 (Tex. Crim. App. 1999) and without providing any analysis of the law to the particular facts here, appellant suggests the State called Fatima for the primary purpose of offering the impeachment testimony. As before, we question whether this issue is adequately briefed. *See* TEX. R. APP. P. 38.1. Regardless, appellant has not shown reversible error.

Under rule 607, any party, including the party calling the witness, may attack the witness's credibility. TEX. R. EVID. 607. A party may not, however, impeach its own witness if the primary purpose of calling the witness is merely to introduce the witness's prior statement before the jury. *See Hughes*, 4 S.W.3d at 4. The impeachment evidence must be excluded under

a Texas Rule of Evidence 403 balancing test because the State profits from the witness's testimony only if the jury misuses the evidence by considering it for its truth. *Id.* Consequently, any probative value the impeachment evidence may have had is substantially outweighed by its prejudicial effect. *Id.* So, if it is "obvious" that a party calls a witness solely to impeach him with otherwise inadmissible statements, the balance tilts towards not permitting the impeachment. *See id.* On the other hand, if the adverse testimony is a surprise to the calling party, that is a factor to be considered when deciding admissibility under rule 403. *Id.* at 5.

In *Hughes*, the defendant was charged with sexually abusing his stepdaughter. The defendant's wife allegedly told CPS workers that her daughter reported the abuse to her, she confronted her husband, and he admitted they were true. 4 S.W.3d at 2–3. At a pretrial hearing, however, the mother denied making those statements. *Id.* The State called the mother at trial and, consistent with her pretrial testimony, she testified she met with CPS workers but denied making the statements regarding her daughter and husband. *Id.* at 3. The State then called the CPS workers to impeach the mother's testimony, and over defense's counsel's objection, they repeated each of the statements allegedly told to them by the mother. *Id.*

The court of criminal appeals concluded that although there were legitimate reasons to call the mother to testify at trial, the State had not offered any explanation for why it expected the mother to testify differently than she had at the pretrial hearing. *Id.* at 6–7. More importantly, the court noted, the State did not elicit any favorable testimony from the mother, which suggests it "was attempting to use [mother's] prior inconsistent statements under the guise of impeachment for the primary purpose of placing before the jury evidence which was not otherwise admissible." *Id.* at 7. The court concluded the State had "little, if any, legitimate purpose" in admitting the mother's prior inconsistent statements to impeach her testimony.

Given the highly prejudicial nature of the evidence, the court concluded any probative value it may have had was substantially outweighed by its prejudicial effect. *Id.*

Unlike *Hughes*, the record here does not suggest the State called Fatima for the primary purpose of eliciting the impeachment testimony. To the contrary, the State elicited substantial favorable testimony from Fatima, who was one of two eyewitnesses to the offense and testified to many incriminating facts against appellant. In particular, she told the jury Villalta did not have a weapon and ran away, and appellant followed and shot him. Certainly, the jury would want to know what Fatima's version of events would be, what she saw, and whether her testimony would be consistent with other evidence in the case. Moreover, as explained by the trial court, the particular evidence was significant to the underlying offense of robbery, which the State had to prove to obtain a capital murder conviction. Finally, evidence that appellant told Fatima to take all her customers' money if she was not paid enough was admissible because a statement by a defendant is not hearsay. *See* TEX. R. EVID. 801(e)(2)(A). We overrule the third issue.

In his fourth issue, appellant contends the trial court abused its discretion by overruling his objection to "extraneous offense evidence of the 'dark sides' of being a prostitute," which included "how money was handled" and "under what circumstances [a prostitute] could have been beaten." In allowing the testimony, the trial court ruled the door had been "opened up" by the defense, that it was relevant, and it was more probative than prejudicial.

Appellant recites the general law regarding extraneous offenses and then concludes, without analysis, that the trial court "acted irrationally by finding that the door had been opened and admitting the evidence of extraneous offenses[.]" Because appellant's issue fails to provide any substantive analysis of the law to the facts of this case, we conclude his issue is inadequately

briefed.  *See* TEX. R. APP. P. 38.1(i); *see also McCarthy*, 65 S.W.3d at 49 n.2 (stating inadequately briefed issue may be waived on appeal).  We overrule the fourth issue.

In his fifth and sixth issues, appellant asserts the trial court erred by denying his requested instructions on the law of defense of his own property and the property of a third person, which he identified as "the prostitute's money of which he shared an interest."  In his seventh issue, he complains the trial court denied his request for an instruction on necessity.

Again, as with previous issues, we question whether appellant has adequately briefed these issues.  Appellant has recited the law regarding defense of property and necessity, but has provided no substantive analysis of that law to the facts of this case.  Regardless, having reviewed the record, we conclude no error is shown.

When a defensive theory is raised by the evidence from any source and a charge is properly requested, it must be submitted to the jury.  *Shaw v. State*, 243 S.W.3d 647, 662 (Tex. Crim. App. 2007).  We review a trial court's decision not to include an instruction on a defensive issue in the jury charge for an abuse of discretion, and we view the evidence in the light most favorable to the defendant's requested submission.  *See Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

Sections 9.42 and 9.43 of the penal code outline when deadly force may be used against another to protect one's own property or the property of a third person.  Appellant relies on these provisions to justify his use of deadly force to protect his and his prostitute's property—the $100 that Alexis charged for the sexual encounter.  Appellant's reliance is misplaced.

Statutes that justify a person forcibly defending his property aid law-abiding citizens to protect their property from thieves and other wrongful takers.  *Jones v. State*, 715 S.W.2d 778, 779 (Tex. App.—Houston [14th Dist.] 1986, no pet.); *Tu v. State*, No. 05-97-00706-CR, 1999 WL 711085, at *3 (Tex. App.—Dallas Sept. 14, 1999, pet. ref'd) (not designated for

publication).  They were not designed, as here, to protect a pimp or prostitute who attempts to recover money from a "john" who does not pay.  *See Jones*, 715 S.W.2d at 779 (in review of charge error, refusing to apply defense of property law to person buying cocaine who later discovers the substance was not cocaine); *Tu*, 1999 WL 711085, at *3 (concluding, in sufficiency review, that sections 9.42 and 9.43 do not apply to drug dealer attempting to recover drugs from another who has stolen them).  The trial court did not err by denying appellant's request for instructions on protection of his property and the property of third persons.  We overrule the fifth and sixth issues.

In his seventh issue, appellant asserts he was entitled to a necessity defense because  the evidence indicated he "reasonably believed his conduct was immediately necessary to avoid imminent harm from the deceased."  Under section 9.22 of the penal code, conduct is justified under necessity, if

> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;
>
> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and
>
> (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22 (West 2011).

This Court has previously held that in a murder case where self-defense is raised, the defense of necessity does not apply.  *Epley v. State*, 704 S.W.2d 502, 506 (Tex. App.—Dallas 1986, pet. ref'd); *Butler v. State*, 663 S.W.2d 492, 496 (Tex. App.—Dallas 1983), *aff'd on other grounds*, 736 S.W.2d 668 (Tex. Crim. App. 1987).  These cases were premised on the notion that allowing a necessity instruction when self-defense using deadly force is an issue would

undermine the Legislature's purpose in imposing the duty to retreat in section 9.32. *Butler*, 663 S.W.2d at 496.

Our decisions, however, were decided under the former version of section 9.32, which contained a "legislative purpose" to require retreat, if a reasonable person would, before using deadly force. *See Butler*, 663 S.W.2d at 496. The Legislature has since amended the statute to remove the retreat provision. *Morales v. State*, 357 S.W.3d 1, 4–5 (Tex. Crim. App. 2011). Thus, a legislative purpose to require retreat before using deadly force no longer "plainly appears" in section 9.32, calling our previous reasoning into question. Nevertheless, we agree with our sister court in Texarkana that section 9.32 still contains a plain legislative purpose precluding a necessity instruction when a section 9.32 defense is implicated. *See Wilson v. State*, No. 06-14-00021-CR, 2014 WL 8332264, at *5 (Tex. App.—Texarkana Nov. 7, 2014, pet. ref'd) (mem. op.).

As set out previously, section 9.32 provides that a person is justified in using deadly force against another if (1) he would be justified in using force against another under section 9.31 and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect him against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, robbery, or aggravated robbery. TEX. PENAL CODE ANN. § § 9.32(a). Thus, a plain reading of the statute reveals the Legislature intended to justify the use of deadly force only when one's life is immediately threatened by another's use of unlawful deadly force or to prevent the commission of specific violent crimes. *See Wilson*, 2014 WL 8332264, at *6. By contrast, the defense of necessity has a much lower threshold, requiring only that the conduct be necessary to "avoid imminent harm." TEX. PENAL CODE ANN. § 9.22(1); *Wilson*¸ 2014 WL 8332264, at *6. "Harm" is defined as "anything reasonably regarded as loss, disadvantage, or injury, including harm to

–14–

another person in whose welfare the person affected is interested." TEX. PENAL CODE ANN. § 1.07(25) (West Supp. 2015). Consequently, allowing an instruction on necessity when, as here, appellant obtained a jury instruction on self-defense using deadly force would undermine the legislative purpose of only allowing deadly force to be used to prevent the immediate threat to one's life or to prevent the commission of specific violent crimes. *Wilson*, 2014 WL 8332264, at *6. We overrule appellant's seventh issue.

We affirm the trial court's judgment.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
150545F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

PROMISE LASHAWN KELLEY,
Appellant

No. 05-15-00545-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 2, Dallas County, Texas
Trial Court Cause No. F-1256130-I.
Opinion delivered by Justice Francis;
Justices Lang-Miers and Myers
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 12, 2016.